IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-20130
_____

UNITED STATES OF AMERICA,

                    Plaintiff-Appellee,

v.

JUAN GARCIA ABREGO,

                    Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

May 6, 1998

Before KING, EMILIO M. GARZA, and DeMOSS, Circuit Judges.

KING, Circuit Judge:

Defendant-appellant Juan Garcia Abrego appeals his conviction and sentence for ten counts of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), five counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), three counts of money laundering in violation of 18 U.S.C. § 1956(a)(2)(A), one count of conspiracy to launder money in violation of 18 U.S.C. § 1956(h), and one count of conducting a continuing criminal enterprise in violation of 21 U.S.C. § 848.  We affirm.

## I.  FACTUAL BACKGROUND

For approximately two decades, Juan Garcia Abrego was the hub of a narcotics smuggling syndicate of staggering dimension. Headquartered in Matamoros, Mexico, Garcia Abrego's organization was responsible for smuggling tremendous quantities of cocaine and marijuana into the United States from the mid-1970s to the mid-1990s.

Garcia Abrego began trafficking large quantities of marijuana in the mid-1970s. In 1976, Carlos Resendez, a long time friend of Garcia Abrego, delivered approximately 300 kilograms of marijuana to him. Francisco "Paco" Perez also began working for Garcia Abrego in the drug trafficking trade around 1980. At Garcia Abrego's direction, Perez unloaded marijuana flown in on a small plane by Oscar "El Profe" Lopez Olivares, stored it in a warehouse on Garcia Abrego's ranch in Soliceno, Mexico, and smuggled it across the border into the United States in inner tubes.

In the early 1980s, Garcia Abrego expanded his operation. According to some members of his organization, in 1985, Garcia Abrego ordered the murder of Casimiro "Cacho" Espinoza, another drug trafficker in Mexico, in order to eliminate competition. Thereafter, Luis Medrano, who had previously worked for Espinoza, went to work for Garcia Abrego.

In 1986, Garcia Abrego began trafficking cocaine because marijuana was a seasonal business. Luis Medrano and Oscar Malherbe worked as managers and supervisors one step below Garcia

2

Abrego in the chain of command in his organization. Medrano and Malherbe enlisted the services of a number of other individuals, including Jaime Rivas Gonzales, Tony Ortiz, Tomas "Gringo" Sanchez, and Juan Ibarra, to transport cocaine into the United States and the rich proceeds from its sale back into Mexico. These individuals in turn utilized the services of numerous other individuals to package and deliver the cocaine and to collect and deliver the money.

Garcia Abrego used money from his drug operation to purchase large ranches in Soto La Marina, an area south of Matamoros. Malherbe and Medrano arranged for loads of cocaine to be flown to these ranches, and from there, the cocaine was moved to Matamoros. The cocaine was smuggled across the border and stockpiled in the Brownsville, Texas area. From there, members of Garcia Abrego's organization arranged the shipment of the cocaine to Houston. From Houston, the drugs were distributed locally and nationally, principally to New York and Los Angeles. Garcia Abrego's organization utilized vehicles with hidden compartments to transport cocaine and proceeds from its sale inside the United States. Until 1990, the organization also utilized INS buses to smuggle narcotics into the United States.

Garcia Abrego's organization trafficked a huge amount of narcotics. Between 1989 and 1993, U.S. law enforcement officials seized over thirteen tons of the organization's cocaine, but this was but a fraction of the amount that the organization

successfully smuggled into the United States.  Jaime Rivas Gonzales testified that he moved between thirty-three and forty tons of cocaine for the organization, and Carlos Rodriguez testified that he moved over fifty tons.  Tony Ortiz testified that he moved 10,000 kilograms of cocaine for the organization.

Garcia Abrego's organization derived substantial profits from its drug trafficking activities.  Members of the organization sold cocaine in Houston for between $17,000 and $23,000 per kilogram and in Los Angeles and New York for between $23,000 and $25,000 per kilogram.  Tony Ortiz testified that he collected $60 to 70 million on behalf of the organization in New York and Houston and shipped it back to Matamoros.

In addition to trafficking narcotics, Garcia Abrego's business also included providing "protection" to other drug traffickers moving narcotics through the Matamoros area.  In the mid-1980s, Carlos Resendez, who had begun working for Garcia Abrego full time, set up a meeting between Garcia Abrego and Fernando "El Aguacate" Martinez, another drug trafficker who sought permission from Garcia Abrego to move cocaine through the Matamoros area.  Garcia Abrego agreed to allow him to do so in exchange for $200,000 for each airplane load brought through the area.

According to some members of his group, when Garcia Abrego got word that Martinez had landed planes without paying the $200,000 fee, he became angry and had his men capture a member of

4

Martinez's organization and beat information out of him regarding the rival organization, including the number and weights of loads of cocaine that the organization transported. In hopes that law enforcement authorities could eliminate his competition for him and save him the trouble of doing it himself, Garcia Abrego turned this information over to FBI Agent Claudio DeLaO, who was masquerading as a corrupt agent in an attempt to effect Garcia Abrego's arrest. Insofar as more direct efforts are concerned, DeLaO asked Garcia Abrego in a subsequent telephone conversation what had happened to the member of Martinez's group from whom he had acquired information. Garcia Abrego responded, "We left him at the Rio Bravo more or less," a comment which DeLaO took to mean that Garcia Abrego had killed him. Garcia Abrego also stated that another member of Martinez's group from whom he had acquired information "already went to heaven." Garcia Abrego then indicated that he had gathered his men to take care of Martinez personally, but that, before they could do so, Mexican federal police arrested Martinez. Thereafter, Garcia Abrego began demanding forty to fifty percent of Colombian traffickers' loads in exchange for the privilege of moving narcotics through the Matamoros area.

Carlos Rodriguez, Sergio "Checo" Gomez, and Jesus "Chuy" Espinoza also paid Garcia Abrego's organization for the privilege of trafficking cocaine through Matamoros. Rodriguez and his cohorts received their cocaine from the Medellin Cartel.

However, Medrano and Malherbe subsequently informed Rodriguez that he and his comrades were being absorbed into Garcia Abrego's organization and that they could no longer purchase cocaine from the Medellin Cartel because their organization worked exclusively with the Cali Cartel.

The hierarchy of Garcia Abrego's organization was firmly established. If a member of the group overstepped his authority, the consequences were dire. In 1991, Tomas "Gringo" Sanchez, a principal player in the New York segment of Garcia Abrego's distribution network, ordered the killing of a Colombian drug trafficker in a Matamoros jail without authorization from Garcia Abrego. As a result of the killing, a riot broke out in the jail, killing two members of Garcia Abrego's organization. Garcia Abrego was upset by Sanchez's acting without authority because of the intense media attention that the riot caused. He had also concluded that Sanchez had gotten out of hand and lost a great deal of money for his organization. Thereafter, Luis Medrano ordered Sanchez killed.

Garcia Abrego protected his business from interference from law enforcement by paying large bribes to Mexican law enforcement officials. Specifically, he ordered individuals in his organization to pay Lopez Parra, a commander in La Procuraduria General de la Republica (the PGR), Luis Esteban Villalon, who was in charge of the federal police for northern Mexico, and Coello Trejo, the Deputy General for the PGR $1.5 million per month.

6

Garcia Abrego also had Francisco Perez purchase clothing for employees of Trejo on a number of occasions. On each occasion, Perez spent from $50,000 to $80,000.

Garcia Abrego also protected his organization by attempting to maintain a low profile. At one point, he informed Perez that he intended to kill two Mexican reporters because they were writing "[t]oo many personal things in the newspaper" about his narcotics trafficking business. When Oscar "El Profe" Lopez Olivares, formerly a valued member of Garcia Abrego's organization, made statements to the press threatening to expose a high-level narcotics operation in Matamoros along with its organizer, Garcia Abrego attempted to have him killed and, through Luis Medrano, enlisted the assistance of Agent DeLaO in this regard.

Lopez Olivares's statements to the press created pressure from law enforcement for Garcia Abrego. He alleviated this pressure through further bribes to government officials. He also moved to Monterey, a city deeper inside Mexico than Matamoros, and essentially went into seclusion so that he was not accessible to people outside his organization.

Sometime in late 1989 or early 1990, $10 million in bribe money from Garcia Abrego's organization failed to reach Coello Trejo. In January 1990, Mexican officials jailed eighteen members of Garcia Abrego's group for possession of firearms, cocaine, and marijuana. Because of pressure from Mexican law

7

enforcement, Garcia Abrego moved to his sister's home in McAllen, Texas and later to an apartment in Chicago. Shortly thereafter, Mexican officials seized Garcia Abrego's ranches and other property in Matamoros.

In December 1990, Garcia Abrego discovered that he was named in a federal indictment that had recently been unsealed, and he therefore fled back to Monterey. After his return to Monterey, Garcia Abrego purchased several million dollars worth of properties, including ranches, which he used as hideouts. From 1991 though 1994, Garcia Abrego remained in hiding and changed locations at least every few weeks and sometimes every few days. Though he was in hiding, Garcia Abrego continued to meet with members of his organization to discuss the drug business. Pursuant to Garcia Abrego's orders, Carlos Resendez acted as an intermediary through whom other members of the group, including Oscar Malherbe and Luis Medrano, went in order to meet with Garcia Abrego.

In 1996, Mexican authorities arrested Garcia Abrego after Resendez informed them where he was hiding. Within a few days, Mexican authorities flew Garcia Abrego to the United States and placed him in the custody of U.S. law enforcement officials.

## II. PROCEDURAL BACKGROUND

A grand jury indicted Garcia Abrego on twenty-two counts of a twenty-eight-count indictment, including ten counts of

possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), five counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), three counts of money laundering in violation of 18 U.S.C. § 1956(a)(2)(A), one count of conspiracy to possess cocaine and marijuana with intent to distribute in violation of 21 U.S.C. § 846, one count of conspiracy to launder money in violation of 18 U.S.C. § 1956(h), one count of conspiracy to import cocaine and marijuana in violation of 21 U.S.C. § 963, and one count of conducting a continuing criminal enterprise (CCE) in violation of 21 U.S.C. § 848. After a lengthy trial, the jury found Garcia Abrego guilty of all twenty-two counts. The district court dismissed the conspiracy to possess cocaine and marijuana with intent to distribute and conspiracy to import cocaine and marijuana counts because they constituted lesser-included offenses of conducting a CCE. The district court imposed a sentence consisting of concurrent terms of life imprisonment followed by concurrent five-year terms of supervised release for the CCE count and for each count of possessing cocaine with intent to distribute. The court sentenced Garcia Abrego to concurrent 240-month terms of imprisonment followed by concurrent 3-year terms of supervised release for the count of conspiracy to launder money and for each of the substantive money laundering counts. The district court also imposed a fine of $128,312,098 and ordered Garcia Abrego to forfeit $350,000,000 in United

9

States currency and substituted assets.  Garcia Abrego appeals his conviction and sentence as to all counts.

### III.  DISCUSSION

Garcia Abrego appeals his conviction and sentence on the following fourteen grounds:

1.   The government's payment of witnesses, grants of immunity, and plea bargaining so distorted the adversary process at Garcia Abrego's trial that the proceedings were rendered fundamentally unfair.

2.   The district court erred in declining to give a requested jury instruction explaining the non-reciprocal nature of the government's offer of incentives to witnesses.

3.   The district court improperly entered a judgment of conviction on the charged substantive drug offenses because it gave the jury a <u>Pinkerton</u> instruction only with respect to the count charging Garcia Abrego with conspiracy to possess cocaine and marijuana with intent to distribute, a count that it later dismissed.

4.   Insufficient evidence supported Garcia Abrego's convictions of the substantive drug offenses.

5.   Insufficient evidence supported Garcia Abrego's convictions of money laundering.

6. Insufficient evidence supported Garcia Abrego's conviction of conspiracy to launder money.

7. Insufficient evidence supported Garcia Abrego's conviction of conducting a CCE.

8. Garcia Abrego's conviction of conspiracy to launder money violated the Ex Post Facto Clause because it was based on conduct that occurred prior to the enactment of the harsher penalty provisions of 18 U.S.C. § 1956(h).

9. Garcia Abrego's custodial statement at the Houston FBI office was rendered involuntary by the fact that it followed an un-_Mirandized_ prior custodial statement made while Garcia Abrego was under the influence of drugs forcibly administered by authorities bringing Garcia Abrego to the United States.

10. Garcia Abrego's inability to understand his _Miranda_ rights rendered his custodial statement involuntary and therefore inadmissible on Fifth Amendment grounds.

11. The district court erred in admitting expert testimony regarding the effect of habitual Valium use.

12. The district court's order of criminal forfeiture violated the Double Jeopardy Clause because it was based in part upon two counts of the indictment that constituted lesser-included offenses of another offense of conviction.

11

13. The district court's admission of testimony that implicated Garcia Abrego in several murders violated Rules 403 and 404(b) of the Federal Rules of Evidence.

14. The district court's admission of foreign records of financial transactions into evidence violated 18 U.S.C. § 3505, the Confrontation Clause, and a number of the Federal Rules of Evidence.

We address each of these issues in turn.

### A. The Government's Provision of Inducements to Its Witnesses

Garcia Abrego contends that the government's extensive use of incentives such as motions for downward departure pursuant to § 5K1.1 of the Sentencing Guidelines, Rule 35 reductions in sentence, immigration permits, cash payments, and grants of immunity from prosecution to motivate many government witnesses to testify denied him his constitutional right to due process. He argues that, because he was denied the opportunity to offer similar incentives to obtain testimony, the adversarial process was skewed to an exceptional degree in the government's favor and that his constitutional right to due process was thereby violated. Garcia Abrego's claim lacks merit.

This court has observed that "[n]o practice is more ingrained in our criminal justice system than the practice of the government calling a witness who is an accessory to the crime for which the defendant is charged and having that witness testify

12

under a plea bargain that promises him a reduced sentence."
United States v. Cervantes-Pacheco, 826 F.2d 310, 315 (5th Cir.
1987) (en banc).  We have also noted that a witness who receives
financial compensation in exchange for testimony has less of an
incentive to testify falsely than a witness who testifies in
exchange for a reduced sentence.  See id.  Accordingly, "[a]s in
the case of the witness who has been promised a reduced sentence,
it is up to the jury to evaluate the credibility of the
compensated witness."  See id. at 315.[1]

    We have acknowledged that the government must observe
certain procedural safeguards when it intends to offer testimony
of a witness receiving some sort of compensation for his
testimony.  See United States v. Bermea, 30 F.3d 1539, 1552 (5th
Cir. 1994).  Specifically, these safeguards include the
following:

> The government must not use or encourage the use of
> perjured testimony; the government must completely and
> timely disclose the fee arrangement to the accused in
> accordance with Brady v. Maryland, 373 U.S. 83, 83 S.
> Ct. 1194, 10 L. Ed. 2d 215 (1963); the accused must be
> given an adequate opportunity to cross-examine the
> informant and government agents about any agreement to
> compensate the witness; and the trial court should give

---

[1] Garcia Abrego urges us to "reconsider" our decision in
Cervantes-Pacheco.  However, in the absence of any intervening
Supreme Court or en banc circuit authority that conflicts with
Cervantes-Pacheco--and Garcia Abrego has pointed to none--we are
bound by our decision in that case.  "It has long been a rule of
this court that no panel of this circuit can overrule a decision
previously made by another."  Ryals v. Estelle, 661 F.2d 904, 906
(5th Cir. Nov. 1981).  This principle applies a fortiori here
because Cervantes-Pacheco is an en banc decision.

13

> a special jury instruction pointing out the suspect
> credibility of paid witnesses.

Id. Garcia Abrego does not contend that the government or the district court failed to comply with any of the above safeguards.

Garcia Abrego contends that he does not seek to resurrect any per se barrier to the admissibility of testimony by witnesses compensated by the government. Rather, he contends that "'due process', fundamental fairness and an accused's meaningful right to some parity in the compulsory process of witnesses will [not] tolerate a system that permits only one side of the adversary process to utilize . . . non-reciprocal incentives to entice witnesses." This court rejected a virtually identical argument in United States v. Thevis, 665 F.2d 616 (5th Cir. Unit B Jan. 1982). In that case, the defendants argued that "the government's granting immunity to its witnesses while denying immunity to [the defendants' prospective witness] skewed the evidence against [the defendants] and denied them a fair trial." Id. at 639. This court rejected the defendants' argument, noting that "[n]o Fifth Circuit case has upheld a grant of immunity by a trial court, and our cases have strongly suggested, without specifically deciding, that courts lack such power under any circumstances." Id. at 639 n.25. The court observed that the only situation in which due process even arguably warrants a judicial grant of immunity to a defense witness is a situation in which the government abuses its power to grant immunity to such a

14

degree that it denies the defendant a fair trial.  See id. at 640-41; see also United States v. Bustamante, 45 F.3d 933, 943 (5th Cir. 1995) ("It is also settled that, unless the government has abused its immunity power, a defendant has no due process right to have the trial court immunize defense witnesses."); United States v. Follin, 979 F.2d 369, 374 (5th Cir. 1992) ("District Courts have no inherent power to grant immunity.  A district court may not grant immunity simply because a witness has essential exculpatory evidence unavailable from other sources.").  Garcia Abrego has alleged no abuse on the part of the government in this case.  Indeed, he has not even alleged the existence of witnesses who would have been willing to testify in his favor had he been able to offer them incentives similar to those offered by the government.

Garcia Abrego nonetheless argues that "the issue here presented is not whether [a] defendant must be accorded immunity for defense witnesses, but rather whether and at what point the prosecution's advantage in obtaining favorable testimony so substantially distorts the delicately balanced adversarial process as to render such proceedings unfair."  Garcia Abrego's argument thus appears to boil down to a contention that the sheer number of witnesses who received some sort of consideration from the government in exchange for their testimony rendered his trial fundamentally unfair.  However, we see no logical basis for departing from the principle articulated in Cervantes-Pacheco and

15

<u>Bermea</u>--that "'it is up to the jury to evaluate the credibility of a compensated witness'"--based merely upon the number of witnesses that received inducements from the government in exchange for their testimony. <u>Bermea</u>, 30 F.3d at 1552 (quoting <u>Cervantes-Pacheco</u>, 826 F.2d at 315). Garcia Abrego's claim that the government violated his right to due process through the use of inducements to obtain favorable testimony from witnesses therefore lacks merit.

### B. Jury Instruction on the Nonreciprocal Nature of Inducements to Government Witnesses

Garcia Abrego contends that, even if the pervasiveness of the government's practice of compensating its witnesses monetarily and otherwise did not of itself violate his right to due process, the district court nonetheless erred in refusing his proposed jury instruction pointing out the non-reciprocal nature of such compensation (i.e., the fact that only the government could offer witnesses incentives such as motions for downward departure and reduction of sentence) and indicating to the jury that the government's witnesses who obtained benefits in exchange for their testimony had a motivation to lie. Garcia Abrego's proposed instruction read in pertinent part as follows:

> Under the current law, the only way that a cooperating witness can receive a reduction of his sentence below the numerically determined guideline range or the mandatory minimum is if a prosecutor files a motion with the sentencing judge asking the judge to reduce the sentence of the witness. You have heard the terms "5K1.1" and "Rule 35" during this case. Those

16

are legal terms that refer to motions filed by the prosecutor to reduce the sentence of a witness based on the witness' cooperation and "substantial assistance" to the government in the arrest or prosecution of another individual. If the prosecutor files the motion before the witness is sentenced, the motion is called a "5K1.1 motion." If the motion is filed after the witness is sentenced, it is called a "Rule 35 motion." The decision to file a "5K1.1 motion" or "Rule 35 motion" is within the sole discretion of the prosecutor. Simply because a witness testifies truthfully does not mean that the prosecutor will file a "5K1.1 motion" or "Rule 35 motion" on the witness' behalf.

Sentencing judges are powerless to reduce the sentence of a cooperating witness below the mandatory minimum or applicable guideline unless the prosecutor files the "5K1.1 motion" or "Rule 35 motion" on behalf of a witness. Moreover, the defense lawyers in this case have no power to file a "5K1.1 motion" or "Rule 35 motion" on behalf of a witness who testifies, and therefore, are powerless to help a cooperating witness receive a reduced sentence.

Therefore, you must carefully evaluate the testimony of any government witness who is cooperating, or has cooperated, in exchange for or with the hope that the prosecutor will file a "5K1.1 motion" or "Rule 35 motion" to reduce the sentence of the witness. You should consider that such a witness may be motivated to please the prosecutor, since only the prosecutor, not the defense lawyers, can help that witness obtain a reduction of his sentence. You must consider the testimony of such a witness with great caution and care.

Garcia Abrego contends that the above instruction was justified in light of the pervasiveness of the government's use of inducements to obtain testimony from its witnesses. He argues that the court's standard cautionary instruction that the juror should view the testimony of an "accomplice" or "informer for pay or for immunity from punishment" with greater caution than other

17

testimony was insufficient to adequately instruct the jury on this issue.  We disagree.

District courts are afforded "substantial latitude in formulating jury charges."  United States v. Asibor, 109 F.3d 1023, 1034 (5th Cir.), cert. denied, 118 S. Ct. 254 (1997), and cert. denied sub nom., 118 S. Ct. 638 (1997).  To that end, we review a district court's refusal to give a proposed jury instruction only for an abuse of discretion.  See id.; United States v. Pineda-Ortuno, 952 F.2d 98, 105 (5th Cir. 1992).  Reversal on the basis of a district court's rejection of a proposed jury instruction is appropriate only if the rejected instruction (1) is substantively correct, (2) is not substantially covered in the charge given, and (3) pertains to an important point in the trial such that failure to give the instruction impairs the defendant's ability to present a given defense effectively.  See United States v. Pipkin, 114 F.3d 528, 535 (5th Cir. 1997).

The district court's instructions cautioning the jury regarding its evaluation of the testimony of accomplices and paid informants tracks the language of the Fifth Circuit Pattern Jury Instructions relating to these issues.  See COMMITTEE ON PATTERN JURY INSTRUCTIONS, DISTRICT JUDGES ASS'N FIFTH CIR., PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) 25-26 (1997).  This court has held that these instructions adequately safeguard a criminal defendant when the government offers the testimony of a compensated informant.  See

18

United States v. Goff, 847 F.2d 149, 161 & n.13 (5th Cir. 1988);

United States v. D'Antignac, 628 F.2d 428, 435-36 n.10 (5th Cir.

1980).    The district court could thus properly conclude that the

instruction that it gave covered the substance of Garcia Abrego's

proposed instruction.[2]    Therefore, the district court's rejection

of Garcia Abrego's proposed jury instruction did not constitute

an abuse of discretion.

### C.    Impact of the Dismissal of the Drug Conspiracy Count on the Substantive Drug Convictions

Counts 3-10, 17, and 28 of Garcia Abrego's indictment

charged him with violations of 18 U.S.C. § 841(a)(1), which

criminalizes the knowing possession of controlled substances,

including cocaine and marijuana, with intent to distribute.

Garcia Abrego contends that his convictions for these substantive

drug offenses are not sustainable on a theory of coconspirator

vicarious liability.    Garcia Abrego notes that the jury received

a Pinkerton instruction in connection with the conspiracy to

---

[2]   We also note that Garcia Abrego's proposed instruction, while perhaps not a technically inaccurate statement of the law, at a minimum had the potential to confuse or mislead the jury. The proposed instruction focuses exclusively on the role of the prosecutor and fails to state expressly that only the court has the authority to grant a § 5K1.1 or Rule 35 motion.  The district court could thus properly conclude that Garcia Abrego's proposed instruction could have given the jury the mistaken impression that the prosecutor actually possesses the authority to reduce the sentences of government witnesses.  See United States v. Tucker, 137 F.3d 1016, 1036 (8th Cir. 1998) (holding that the district court did not abuse its discretion in denying the defendant's proposed instruction because it had the potential for "misleading the jury and would have focussed the jury's attention on collateral issues").

19

possess cocaine with intent to distribute count which instructed the jury that, if it found Garcia Abrego guilty of that count, it could convict him of any substantive drug offenses committed by a coconspirator in furtherance of the conspiracy even though Garcia Abrego did not participate in the substantive offenses or have any knowledge of them.  See Pinkerton v. United States, 328 U.S. 640, 645-47 (1946).  However, after the jury returned a verdict of guilty with respect to all counts, the district court dismissed the drug conspiracy count because it constituted a lesser-included offense of conducting a CCE.

Garcia Abrego argues that he could not be convicted pursuant to the Pinkerton instruction because the district court dismissed the drug conspiracy count upon which the charge was based.  He therefore contends that his convictions for the substantive drug offenses cannot stand because insufficient evidence exists to prove that he is directly liable for these offenses--that is, insufficient evidence exists for the jury to conclude beyond a reasonable doubt that he actually or constructively possessed the cocaine in question with intent to distribute it.  The gist of Garcia Abrego's argument appears to be that he cannot be convicted of the substantive drug offenses on a coconspirator vicarious liability theory because the district court did not enter judgment convicting him on the drug conspiracy count even though the jury found him guilty on that count.  Garcia Abrego has cited no authority in support of this contention.

20

Assuming, merely for the sake of argument, that a conspiracy conviction is a necessary predicate to a conviction of substantive offenses on the basis of a theory of coconspirator vicarious liability, such a conviction exists in this case because the jury also found Garcia Abrego guilty of conducting a CCE, and the district court entered a judgment of conviction on this count. The Supreme Court has held that conspiracy constitutes a lesser-included offense of conducting a CCE. See Rutledge v. United States, 517 U.S. 292 (1996). Therefore, in finding Garcia Abrego guilty of conducting a CCE, the jury necessarily found that he participated in a conspiracy. Garcia Abrego's conviction of conducting a CCE is thus tantamount to a conspiracy conviction. See United States v. Graewe, 774 F.2d 106, 108 (6th Cir. 1985) ("A [CCE] charge is a conspiracy charge, and one convicted of a CCE is subject to Pinkerton liability.").[3]

---

[3] Garcia Abrego contends that the CCE conviction provides no basis for sustaining his substantive drug convictions on a theory of coconspirator vicarious liability because the Pinkerton instruction did not inform the jury that, if it found Garcia Abrego guilty of conducting a CCE, it could convict him of any substantive drug offenses committed in furtherance of the CCE. However, the authorities that Garcia Abrego cites in support of this proposition establish nothing more than that the jury charge must inform the jury of the Pinkerton principle in order for a conviction of a substantive offense to be sustainable on the basis of coconspirator vicarious liability. See United States v. Sanchez-Sotelo, 8 F.3d 202, 208 (5th Cir. 1993); United States v. Pierce, 893 F.2d 669, 675-76 (5th Cir. 1990). As indicated supra, the jury charge accurately apprised the jury of the Pinkerton principle.

The jury instruction in this case expressly apprised the jury of the <u>Pinkerton</u> principle. As the government observes, in finding Garcia Abrego guilty of the drug conspiracy count, the jury found beyond a reasonable doubt that a drug conspiracy existed and that Garcia Abrego was a voluntary participant in this conspiracy. Moreover, the district court dismissed the drug conspiracy count only because it constituted a lesser-included offense of the CCE count of which the jury also found Garcia Abrego guilty. We therefore conclude that the district court's dismissal of the drug conspiracy count in connection with which the jury received the <u>Pinkerton</u> instruction does not foreclose our affirmance of Garcia Abrego's convictions of the substantive drug offenses on the basis of coconspirator vicarious liability.

### D. Sufficiency of the Evidence Supporting the Substantive Drug Convictions

Garcia Abrego further argues that, even if the district court's dismissal of the drug conspiracy count in connection with which the jury received the <u>Pinkerton</u> instruction does not foreclose our affirmance of his convictions on the substantive drug counts on a theory of coconspirator vicarious liability, we must nonetheless reverse these convictions because insufficient evidence exists to support them on the basis of such a theory. We disagree.

Criminal convictions are supported by sufficient evidence "if a reasonable trier of fact could conclude that the elements

22

of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the jury's verdict and drawing all reasonable inferences from the evidence to support the verdict." United States v. Mmahat, 106 F.3d 89, 97 (5th Cir.), cert. denied, 118 S. Ct. 200 (1997). As indicated below, we conclude that, viewing the evidence in the light most favorable to the verdict, the jury could have concluded beyond a reasonable doubt (1) that Garcia Abrego was involved in a criminal conspiracy and (2) that the substantive drug offenses were committed in furtherance of the conspiracy. We therefore conclude that sufficient evidence exists to support Garcia Abrego's convictions of the substantive drug counts.

### 1. Sufficiency of the evidence establishing a conspiracy

Circumstantial evidence may establish the existence of a conspiracy, as well as an individual's voluntary participation in it, and "[c]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation . . . be sufficient to constitute conclusive proof." United States v. Roberts, 913 F.2d 211, 218 (5th Cir. 1990) (internal quotation marks omitted). "Therefore, we have consistently held that the jury may infer the existence of a conspiracy from the presence, association, and concerted action of the defendant with others." United States v. Gonzales, 121 F.3d 928, 935 (5th Cir. 1997), cert. denied, 118 S. Ct. 726 (1998), and cert. denied, 118 S. Ct.

23

1084 (1998).  To be convicted of engaging in a criminal conspiracy, an individual "need not know all the details of the unlawful enterprise or know the exact number or identity of all the co-conspirators, so long as he knowingly participates in some fashion in the larger objectives of the conspiracy."  United States v. Westbrook, 119 F.3d 1176, 1189 (5th Cir. 1997), cert. denied sub nom., 118 S. Ct. 1059 (1998), and cert. denied sub nom., 118 S. Ct. 1060 (1998); see also United States v. Fernandez-Roque, 703 F.2d 808, 814-15 (5th Cir. 1983).  Furthermore, a conviction may be sustained solely on the basis of the testimony of a coconspirator--even a coconspirator who testifies on the basis of a plea bargain or promise of leniency-- so long as that testimony is not incredible as a matter of law-- that is, so long as it does not defy the laws of nature or relate to matters that the witness could not have observed.  See Bermea, 30 F.3d at 1552.

In this case, the record contains evidence more than ample to support the jury's conclusion that Garcia Abrego engaged in a conspiracy that had as its objects the violation of federal narcotics and money laundering laws.  The testimony of numerous coconspirators establishes that Garcia Abrego cast a conspiratorial net that was far-reaching and encompassed a large number of individuals who aided in his drug trafficking enterprise.  Outlined below is the testimony that established the general framework of Garcia Abrego's organization.

Carlos Resendez testified that he engaged in the drug trafficking business with Garcia Abrego beginning in 1976 and later went to work for him in that business full time, continuing until his arrest in April of 1994.  Resendez testified that Garcia Abrego met directly with Luis Medrano, Oscar Malherbe, and Sergio "Checo" Gomez regarding the narcotics trafficking business.  He also testified that Garcia Abrego was Medrano and Malherbe's boss, as well as the head of the entire drug organization.  Francisco Perez testified that he began moving drugs for Garcia Abrego in 1980 and continued to do so until his arrest in August 1993.  Agent Claudio DeLaO testified that, during conversations with Luis Medrano, Medrano referred to Garcia Abrego as "El Jefe" and "Patron," both Spanish words signifying substantial authority.  In a recorded statement, Medrano also stated that he went to work for "El Jefe" after Casimiro Espinoza, Medrano's former employer in the drug trafficking business, was killed.  According to the testimony of a number of Garcia Abrego's coconspirators, including Carlos Rodriguez, Tomas "Gringo" Sanchez supervised cocaine distribution for Garcia Abrego's group in the New York area until he was killed.

The individuals who worked directly with Garcia Abrego, along with Sanchez, arranged for the transportation of drugs and proceeds from their sale in the United States through a number of other individuals.  Tony Ortiz testified that he transported

25

cocaine into the United States at the direction of Luis Medrano. Francisco Segura testified that he originally worked for Tony Ortiz and was later ordered by Medrano and Malherbe to collect drug debts in New York. Carlos Rodriguez testified that he began trafficking cocaine at the direction of Medrano and Malherbe in 1986 and that they dictated the Colombian cartel with whom he was allowed to do business. William Allen Hoffman testified that he delivered ten to twenty loads of cocaine for Medrano and that, when he delivered loads to New York, his contact person there was Sanchez. Jaime Rivas testified that he transported cocaine from Harlingen to Houston for Luis Medrano and that he met with Medrano regarding the transportation of cocaine up to two or three times per week. Rivas also testified that Elias "El Profe" Garcia and Hilario Gonzalez were involved in arranging transportation of cocaine for the group. Tony Ortiz testified that Juan Ibarra worked for Sanchez receiving cocaine and arranging for the shipment of drug proceeds back down south to Houston. Horace Vega, who testified that he moved money for the group and acted as a confidential informant for the FBI, testified that Ibarra replaced Sanchez as the point man for the group's operations in New York after Sanchez was killed.

A number of coconspirators testified that Garcia Abrego utilized several individuals to manage the proceeds of his drug trafficking enterprise. Francisco Perez testified that Fernando Herrerra was in charge of managing Garcia Abrego's drug proceeds.

26

Perez also testified that Garcia Abrego instructed Ricardo Aguirre, who the documentary evidence indicated was listed as a beneficial owner on several of the investment accounts in which Garcia Abrego placed his drug proceeds, to move $25 million from Mexico to the United States during the time period that Garcia Abrego was hiding in Chicago as a result of increased pressure and property seizures by Mexican authorities. Additionally, a number of witnesses testified that Garcia Abrego's group employed a number of pilots, hit men, and body guards.

Garcia Abrego himself told federal law enforcement officials during an interview that he began trafficking marijuana in 1979 and switched to cocaine in 1987. He stated that he moved between 800 and 1000 pounds of marijuana and 100 kilograms of cocaine per month. He also stated that he progressed to moving loads of cocaine ranging from 150 to 200 kilograms. He told federal law enforcement agents that he moved narcotics across the U.S./Mexico border with the assistance of Mexican judicial police, who would inform him when he could safely move a load across the border.

Clearly the jury was presented with sufficient evidence for it to rationally conclude beyond a reasonable doubt that a wide-ranging criminal conspiracy of which Garcia Abrego knew and in which he participated existed. Furthermore, sufficient evidence existed for the jury to rationally conclude beyond a reasonable doubt that each of the substantive drug offenses charged was committed in furtherance of the conspiracy.

27

## 2.  Sufficiency of the evidence linking the substantive drug offenses to the conspiracy

As an initial matter, we note that Garcia Abrego does not contest that sufficient evidence exists to prove that the substantive drug offenses alleged were committed by someone; rather he alleges that the evidence was insufficient to link the offenses to him.  We conclude that sufficient evidence existed for the jury to conclude that each of the substantive drug offenses was committed by one or more of Garcia Abrego's coconspirators in furtherance of the conspiracy.

Count 3 of the indictment was based upon the seizure of 825 kilograms of cocaine at the Sarita, Texas border patrol checkpoint on March 14, 1989.  The cocaine was discovered in a secret compartment in an 18-wheeler driven by Raciel Garcia Contreras and also occupied by Juan David Garcia.  Jaime Rivas testified that he informed Medrano about the load of cocaine lost at the Sarita checkpoint and that Medrano instructed Malherbe to tell "El Señor" about the lost load.  At this point, Medrano informed Rivas that Garcia Abrego was the boss and that he had to be told about the seizure.  From this evidence, the jury could reasonably conclude that the drug offense described in count 3 was committed by Garcia Abrego's coconspirators in furtherance of the conspiracy.

Count 4 was based upon the seizure of 291 kilograms of cocaine from a Tioga motor home driven by William Hoffman in

28

Queens, New York on May 3, 1989.  Hoffman testified that he purchased the motor home at the direction of Medrano and that Medrano instructed him to take the motor home to Grand Prairie, Texas to have a false bottom put in it.  Hoffman also testified that the seized cocaine was loaded into the trailer under the supervision of Hilario Gonzalez and at the direction of Elias "El Profe" Garcia.  From this evidence, the jury could reasonably conclude that the drug offense described in count 4 was committed by Garcia Abrego's coconspirators in furtherance of the conspiracy.

Count 5 of the indictment was based in part upon the seizure of 415 kilograms of cocaine from the residence of Frederico Munguia on Krenek Road in Houston, Texas on August 28, 1989. Carlos Rodriguez testified that Munguia transported cocaine for the drug organization with which he, Garcia Abrego, Medrano, and Malherbe were involved.  Additionally, Rivas testified that, on August 29, 1989, he contacted Medrano and told him that the cocaine that he had delivered to Munguia the previous evening had been seized.  According to Rivas, Medrano then instructed him to contact Munguia in San Antonio and have him come to Houston. Based upon this evidence, the jury could reasonably conclude that the drug offense charged in count 5 was committed by Garcia Abrego's coconspirators in furtherance of the conspiracy.

Count 6 was based upon the seizure of twenty kilograms of cocaine from a mustang driven by Emilio Rivera as he left the

29

residence of Hilario Gonzalez's father-in-law on Arrowrock Road in Houston and 160 kilograms of cocaine seized from the residence itself on September 18, 1989. Rivas testified that Gonzalez used the Arrowrock residence to store cocaine that Rivas delivered to him in Houston. Additionally, Rivas testified that Medrano informed him of the seizure of cocaine at the Arrowrock residence. From this evidence, the jury could reasonably conclude that the drug offense charged in count 6 was committed by Garcia Abrego's coconspirators in furtherance of the conspiracy.

Count 7 was based upon the seizure of 645 kilograms of cocaine from a residence on Ridgeside Street in North Houston. FBI agents testified that, prior to the seizure, they were conducting surveillance at Bonnie's Nursery, a nursery near Humble, Texas on September 22, 1989. The agents observed a large white refrigerator truck and a van. The agents testified that several individuals were taking items out of the truck and placing them in the van. The vehicles departed. Subsequently, FBI agents had local law enforcement officials stop the truck, and the driver was identified as Jaime Rivas. The van drove to the Ridgeside residence and backed up to the residence's garage. An FBI agent walked by the residence and overheard the sound of heavy objects being dropped and dragged across the floor of the garage. A later search of the residence uncovered 645 kilograms of cocaine in military-style duffle bags of a type similar to

30

duffle bags found by the FBI at Bonnie's Nursery.  Rivas testified that he was subsequently informed of the seizure by Elias "El Profe" Ruiz.  From this evidence, the jury could reasonably conclude that the drug offense described in count 7 was committed by Garcia Abrego's coconspirators in furtherance of the conspiracy.

Count 8 was based upon the seizure of approximately 9 tons of cocaine from a residence on Bass Boulevard near Harlingen, Texas on October 4, 1989.  Rivas testified that he moved between 30,000 and 40,000 kilograms of cocaine through the Bass Boulevard location.  Law enforcement officials also seized ledgers at the Bass Boulevard residence indicating that cocaine had been shipped from the location on August 28, 1989, the same date as the seizure of cocaine at Krenek Road, and indicating that 645 kilograms of cocaine had been shipped at some point prior to September 29, 1989, which coincided with the size and date of the shipment seized from the Ridgeside residence on September 22, 1989.

Francisco Perez testified that he showed Garcia Abrego a newspaper article reporting the Bass Boulevard seizure and that, in response, Garcia Abrego stated that "the boys had goofed." Perez also testified that everyone in the drug trafficking organization, including Garcia Abrego, referred to Medrano and Malherbe as "the boys."  Resendez testified that he had a conversation with Garcia Abrego about the Bass Boulevard seizure.

31

He testified that Garcia Abrego was angry and stated that the seizure was a result of having too many people involved in the organization. He also testified that Garcia Abrego stated that the individuals arrested in connection with the Bass Boulevard seizure had been calling, asking him for help. Based upon this evidence, the jury could reasonably conclude that the drug offense charged in count 8 was committed by Garcia Abrego's coconspirators in furtherance of the conspiracy.

Count 9 was based upon the seizure of 603 kilograms of cocaine from a tractor-trailer rig stuck in a ditch at a warehouse located on Almeda-Genoa in Houston on November 6, 1989. The warehouse was located directly in front of a house on South Wayside, a street that runs perpendicularly to Almeda Genoa. A search of the house on South Wayside revealed duffle bags similar to the ones discovered in the search of Bonnie's Nursery. Rivas testified that an individual he knew as "Bono," whom an FBI agent identified as Jose Bernardo Nieto, had previously shown him the Almeda-Genoa warehouse and indicated that it was a potential delivery point for cocaine in Houston. Rivas also testified that, during a telephone conversation, Nieto told him that he had lost a load of cocaine at the Almeda-Genoa warehouse. Tony Ortiz testified that he had met Nieto at Medrano's home, where Nieto was meeting with Medrano to discuss cocaine transportation. According to Ortiz, Nieto had lost a load of the organization's cocaine, and Medrano did not want to use him for transportation

32

anymore.  Medrano met with Nieto to make arrangements for Nieto to turn over the cocaine that he still had to Ortiz for transportation.  Based upon this evidence, the jury could reasonably conclude that the drug offense described in count 9 was committed by Garcia Abrego's coconspirators in furtherance of the conspiracy.

Count 10 was based upon the seizure of two loads of cocaine, both in excess of 300 kilograms, from the Nole Hace Ranch and from a mobile home in Jones Creek, Texas.  One of the FBI agents involved in the seizure at the Almeda-Genoa warehouse testified that he was conducting surveillance at the Wharton airport in Houston and that he observed a blue pickup registered to Guadalupe Velez.  The agent testified that he had previously observed a black pick-up registered to Velez at the Almeda-Genoa warehouse.  FBI agents followed the blue pickup to the Nole Hace Ranch, which is located near Clute, Texas.  As the blue pickup drove into the ranch, it was met by the black pickup that agents had previously observed at the Almeda-Genoa warehouse.  Both trucks drove back toward the ranch.  Later that afternoon, the blue truck drove back to the Wharton airport and then to the mobile home in Jones Creek, which was owned by Guadalupe Velez's sister.  FBI agents subsequently searched the mobile home and the Nole Hace Ranch, discovering more than 300 kilograms of cocaine at each location.  Phone records seized at the Almeda-Genoa warehouse and the Nole Hace Ranch indicated that one telephone

call had been made from the South Wayside house located behind the Almeda Genoa warehouse to the Nole Hace Ranch and that four telephone calls were made from the Nole Hace Ranch to the South Wayside house. As noted earlier, Rivas testified that the Almeda-Genoa warehouse was a potential delivery point for the organization's cocaine. Based upon this testimony, in connection with the circumstantial evidence surrounding the two seizures at issue in count 10, the jury could reasonably infer that the drug offense described in count 10 was committed by Garcia Abrego's coconspirators in furtherance of the conspiracy.

Count 17 was based upon the seizure of 850 kilograms of cocaine recovered from a warehouse on Sunshine Strip in Harlingen leased to Benito Gonzales and a truck that was searched shortly after it left the warehouse. Benito Gonzales was the brother of Marcos Gonzales, who Tony Ortiz testified worked for him transporting cocaine. Ortiz also testified that Benito Gonzales helped his brother in picking up, packaging, and delivering cocaine. Prior to searching the truck, U.S. customs officials had executed a search warrant on the warehouse and discovered metal boxes filled with cocaine and sealed inside wooden crates. Upon searching the truck, customs officials found cocaine packed in the same manner. This evidence, combined with Tony Ortiz's testimony regarding his involvement in the overall conspiracy constitutes ample evidence from which the jury could reasonably conclude that the drug offense charged in count 17 was committed

34

by Garcia Abrego's coconspirators in furtherance of the conspiracy.

Count 28 was based upon the seizure of 1000 kilograms of cocaine that were delivered to the New Jersey warehouse of George Paulicastro, an individual who was cooperating with the DEA. Carlos Rodriguez testified that he arranged shipments of cocaine to George Paulicastro's warehouse in New Jersey. A special agent for the DEA testified that, when the load of cocaine reached Paulicastro's warehouse on April 3, 1993, all but 10 kilograms of it was replaced with fake cocaine. Carlos Rodriguez testified that he was arrested in connection with the delivery. On April 9, 1993, Paulicastro delivered the cocaine in a rental truck to Francisco Segura. Segura was later arrested, and at that time he had in his possession a telephone book containing a code that Segura testified was given to him by Medrano for use in deciphering encoded telephone numbers given to Segura by group members. Based upon this evidence, the jury could reasonably conclude that the drug offense described in count 28 was committed by Garcia Abrego's coconspirators in furtherance of the conspiracy.

### E. Sufficiency of the Evidence Supporting the Substantive Money Laundering Convictions

Garcia Abrego claims that insufficient evidence exists to support his convictions of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and (a)(2)(A). We conclude, however,

35

that the government adduced evidence sufficient to support each count of conviction.

### 1. Section 1956(a)(1)(A)(i)

Counts 2, 11-13, and 16 charged Garcia Abrego with laundering money in violation of 18 U.S.C. § 1956(a)(1)(A)(i), which criminalizes engaging in a financial transaction involving the proceeds of an unlawful activity with the intent to promote a specified unlawful activity.[4]  For purposes of § 1956(a)(1), a transaction is "'a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition' or some action involving a financial institution or its facilities."  United States v. Puig-Infante, 19 F.3d 929, 938 (5th Cir. 1994) (quoting 18 U.S.C. § 1956(c)(3)).  "'Disposition' most commonly means 'a placing elsewhere, a giving over to the care or possession of another.'"

---

[4]  Section 1956(a)(1) provides in relevant part as follows:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--
    (A)(i) with the intent to promote the carrying on of specified unlawful activity . . .
shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1).

<u>Id.</u> (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 654 (Philip Babcock Grove ed. 1961)).[5]

Garcia Abrego contends that the evidence adduced at trial was insufficient to support his convictions for counts 2, 11-13, and 16 because (1) the government failed to prove a transaction involving the funds at issue in each count because it offered no evidence of a disposition of the funds and (2) none of the funds were transferred to Garcia Abrego.[6]  We disagree.  Sufficient evidence exists for the jury to conclude that the funds at issue in each of these counts were utilized in some form of transaction and that the money laundering offenses were committed by Garcia Abrego's coconspirators in furtherance of the conspiracy described in Part III.D.1, <u>supra</u>.

---

[5]  A particular transaction constitutes a "financial transaction" if it "in any way or degree affects interstate or foreign commerce [and] (i) involv[es] the movement of funds by wire or other means or (ii) involv[es] one or more monetary instruments."  18 U.S.C. § 1956(c)(4)(A); <u>see</u> <u>also</u> <u>Puig-Infante</u>, 19 F.3d at 938.  As indicated <u>infra</u>, Garcia Abrego challenges only the sufficiency of the evidence to establish that the funds at issue in each count alleging a violation of § 1956(a)(1)(A)(i) were involved in a transaction.  He does <u>not</u> contend that any transaction in which the government proved the funds were involved did not meet the above definition of <u>financial</u> transaction.  Therefore, we address only the issue of whether sufficient evidence existed for the jury to conclude beyond a reasonable doubt that the funds at issue in each count were subject to a transaction.

[6]  Garcia Abrego does not challenge the sufficiency of the evidence to establish that the money at issue in each of the money laundering counts constituted the proceeds of narcotics trafficking or that the transfers at issue were made for the purpose of promoting narcotics trafficking activity.

Count 2 was based upon the seizure of $4,012,549 on February 4, 1989 from a secret compartment in a van at Rapid Truck Repair in Houston.  A special agent for the Criminal Investigation Division of the Internal Revenue Service testified that, on February 1, 1989, Alexander Guzman and Hector Castano had driven the van to Memorial City Mall.  At the mall, they turned the van over to Fernando Cordona and Henry Cortez, who had arrived at the mall in another vehicle.  From this point forward, law enforcement officials maintained constant surveillance of the van until the time of its seizure.  Cordona and Cortez took the van to a residence on Langbourne Street in Houston.  The next day, Cortez drove the van back to Memorial City Mall and turned it over to an unidentified individual who drove the van to Rapid Truck Repair.  The jury could reasonably conclude that this series of events involved one or more dispositions of the money later recovered from the van because, on more than one occasion, the van, along with its contents, was "giv[en] over to the care or possession of another."  Puig-Infante, 19 F.3d at 938 (internal quotation marks omitted).

Jaime Rivas testified that he was responsible for delivering the load of money seized at Rapid Truck Repair to Matamoros, Mexico and that he received his instructions on the disposition of the money from Luis Medrano.  From this testimony, the jury could reasonably conclude that the money laundering offense

38

described in count 2 was committed by Garcia Abrego's coconspirators in furtherance of the conspiracy.

Count 11 was based upon the seizure of $2.4 million that resulted from the search of a Jeep Wagoneer driven by Juan Miguel "Gordo" Lizardi Garcia at the International Bridge.  Carlos Resendez testified that Lizardi Garcia worked for Garcia Abrego's organization.  An FBI agent testified that, prior to this seizure, law enforcement officials intercepted a telephone conversation between Tomas "Gringo" Sanchez and Hilario Gonzales. Hilario Gonzales subsequently ordered Guadalupe Manuel Lopez to rent a large U-Haul truck, load it with clothing and furniture, and turn it over to other individuals in the southwest part of Houston.  Law enforcement officials observed Lopez comply with these orders on April 7, 1997.  The individuals to whom Lopez turned over the truck drove it to the Southwest Terrace Apartments on Bassford in Houston.  Tony Ortiz testified that he had an apartment in this complex.

Two days later, Lopez drove the truck to a residence in Brownsville on Monterey Street.  He then turned the vehicle over to some individuals at that residence and left for the airport. Law enforcement officials then observed these unidentified individuals unload the contents of the truck, dumping all of the clothing and furniture into the yard and taking 21 U-Haul boxes into the house.  Law enforcement officers maintained surveillance on the Monterrey Street house until April 11, 1990.  The entire

39

time, the clothing and furniture remained dumped in the yard. Law enforcement officials also observed a Jeep Wagoneer at the Monterey Street house. On April 11, Lizardi Garcia was stopped on the International Bridge in this same Jeep Wagoneer. A search of the vehicle revealed U-Haul boxes filled with bundles of U.S. currency.

The above evidence would allow the jury to conclude that the funds seized from the Jeep Wagoneer had been "giv[en] over to the care or possession of another" one or more times, thus establishing the transaction element of the money laundering offense. Puig-Infante, 19 F.3d at 938 (internal quotation marks omitted). Furthermore, the involvement of Tomas "Gringo" Sanchez and the use of Tony Ortiz's apartment in transporting the money provides, along with Resendez's testimony that Lizardi Garcia worked for Garcia Abrego's group, provides sufficient evidence for the jury to reasonably conclude that the money laundering offense described in count 11 was committed by Garcia Abrego's coconspirators in furtherance of the conspiracy.

Count 12 is based upon $108,000 that Horace Vega received at Carpet Masters in Houston from Jesse Ceballos on February 23, 1991. Vega testified that, in January 1991, he met with Luis Medrano and discussed building a frozen food warehouse that would be used to distribute cocaine. Medrano agreed to pay the $3.5 million necessary to set up the warehouse. He stated that he would provide Vega with $100,000 to secure a contract for the

40

warehouse's construction and would pay $1 million a week after the contract was secured. Thereafter, he would pay $1 million per year until the contract price was paid. Medrano told Vega that he would receive the money from Jesse Ceballos and Juan Ibarra in Houston.

On two subsequent occasions, Vega attempted to arrange to pick up the $100,000 in Houston, but did not receive it. On the second attempt, Juan Ibarra told him that he could not pay the $100,000 because the group was attempting to reestablish protection in Mexico. Thereafter, Vega spoke with Medrano again, and Medrano became upset when he found out that Vega had not been able to pick up the money necessary to secure a contract for the warehouse. In a later taped conversation, Vega and Jesse Ceballos arranged for Vega to pick up the money at Carpet Masters. The transfer of the $108,000 to Vega clearly constituted "a giving over to the care or possession of another," and thus a transaction for purposes of establishing a money laundering offense. Puig-Infante, 19 F.3d at 938. Additionally, the involvement of Luis Medrano in the transfer and the fact that the transfer was made to facilitate the building of a warehouse to be used to distribute narcotics provide ample basis for the jury to conclude that the offense described in count 12 was committed by Garcia Abrego's coconspirators in furtherance of the conspiracy.

Count 13 was based upon Vega's receipt of $50,000 from Alex Ceballos, the brother of Jesse Ceballos, at Carpet Masters on May 3, 1991. In recorded conversations on May 2, 1991, Vega and Jesse Ceballos discussed Vega's having a secret compartment built into a trailer for the transport of cocaine. Vega told Ceballos that he would need $50,000 to have this done. Additionally, Juan Ibarra was present when Vega picked up the money on May 3, 1991. The conveyance of the money to Vega constituted a transaction. Given that Medrano had previously told Vega to contact Ceballos and Ibarra in connection with another transaction, the jury had ample basis for concluding that the money laundering offense described in count 13 was committed by Garcia Abrego's coconspirators in furtherance of the conspiracy.

Count 16 was based upon Vega's payment of $7,965 for 8 trash compactors and 700 bags for use in packaging marijuana. Vega testified that he received orders from Jesse Ceballos to purchase the trash compactors because Luis Medrano needed them to package 40,000 pounds of marijuana. The government offered into evidence a recorded conversation between Vega and Ceballos to this effect. Vega testified that he then went to Houston, met up with Oscar Abelenda, a cocaine dealer who was a customer of Ceballos. Vega and Abelenda then purchased the trash compactors and bags. The jury could reasonably conclude that Vega's purchase of the trash compactors and bags entailed a transaction within the meaning of § 1956(a)(1). See 18 U.S.C. § 1956(c)(3) (defining transaction

42

to include a purchase).  Further, based upon the fact that Vega undertook the transaction pursuant to orders from Medrano to purchase materials and equipment necessary to facilitate drug trafficking, the jury could reasonably conclude that the offense described in count 16 was committed by Garcia Abrego's coconspirators in furtherance of the conspiracy.

### 2.  Section 1956(a)(2)(A)

Counts 14, 15, and 27 charged Garcia Abrego with violation of 18 U.S.C. § 1956(a)(2)(A), which criminalizes the transportation, transmission, or transfer of a monetary instrument or funds from a place inside the United States to a place outside the United States with the intent to promote the carrying on of a specified unlawful activity.  See United States v. Savage, 67 F.3d 1435, 1440 (9th Cir. 1995).[7]  As with the substantive drug offenses, Garcia Abrego does not contend that

---

[7]  Section 1956(a)(2) provides in relevant part as follows:

(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States--
   (A) with the intent to promote the carrying on of specified unlawful activity . . .
shall be sentenced to a fine of not more than $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission, or transfer whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(2).

43

the evidence was insufficient to establish that the offenses charged in counts 14, 15, and 27 occurred.[8]  Rather, he contends that insufficient evidence exists to link him to the offenses. However, as with the counts alleging violations of § 1956(a)(1)(A)(i), we conclude that sufficient evidence exists to demonstrate that the offenses were committed by Garcia Abrego's coconspirators in furtherance of the conspiracy. Accordingly, Garcia Abrego's convictions are sustainable on a theory of coconspirator vicarious liability.

Count 14 was based upon the delivery of $1.4 million of the organization's funds from Houston to Matamoros, Mexico on September 7, 1991.  Vega testified that, on September 6, 1991, he picked up $1.4 million from Jesse Ceballos at a residence in

---

[8]  Garcia Abrego asserts that the funds at issue in these counts were not exported to Matamoros, Mexico.  However, with respect to counts 14 and 15, the record citations that he provides in support of this proposition do not indicate that the funds at issue were not exported to Matamoros, Mexico. Furthermore, as indicated infra, the evidence presented at trial indicated that the funds at issue in these two counts were transported across the Mexican border, which satisfies § 1956(a)(2)(A)'s requirement that the funds be transferred from a point inside the United States to a point outside the United States.

Furthermore, as indicated infra, the funds at issue in count 27 were seized from a vehicle on the International Bridge driving toward Mexico.  The fact that the funds were seized before they actually passed from the United States into Mexico is irrelevant for purposes of § 1956(a)(2)(A) because the statute also criminalizes an "attempt[] to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States."  18 U.S.C. § 1956(a)(2) (emphasis added).

44

Houston pursuant to instructions from Malherbe and Medrano. He further testified that, pursuant to his instructions from the prior day, on September 7, 1991, he turned the money over to an individual that he knew as Pinata, who transported the money into Mexico. Based upon Vega's testimony that he acted at the behest of Malherbe and Medrano, the jury could reasonably conclude that the money laundering offense described in count 14 was committed by Garcia Abrego's coconspirators in furtherance of the conspiracy.

Count 15 was based upon the delivery of $1.463 million of the organization's money from Houston to Matamoros on September 26, 1991. Vega testified that, pursuant to instructions from Jesse Ceballos, he picked up the money in Houston on September 25, 1991. He testified that he then drove the money to the Rio Grande Valley, where he met Carlos Salazar. From there, Salazar's sister, Ninfa Lopez, drove Vega's vehicle, and Vega road with Salazar to the Mexican border. At the border, Salazar told a Mexican Customs official that they worked for El Señor, and they were waived through. Vega testified that they then delivered the money to Matamoros. Based upon this testimony, the jury could reasonably conclude that the money laundering offense described in count 15 was committed by Garcia Abrego's coconspirators in furtherance of the conspiracy.

Count 27 was based upon the seizure of $528,000 from a vehicle driven by Roberto Villareal as he attempted to cross into

45

Mexico on the International Bridge on May 6, 1992. Carlos Rodriguez testified that Villareal was the cousin of Sergio "Checo" Gomez and that he was helping the organization smuggle drug proceeds into Mexico at the time of this seizure. Based upon this testimony, the jury could reasonably conclude that the money laundering offense described in count 27 was committed by Garcia Abrego's coconspirators in furtherance of the conspiracy.

### F. Sufficiency of the Evidence Supporting the Conviction for Conspiracy to Launder Money

Count 18 of Garcia Abrego's indictment charged him with conspiracy to launder money in violation of 18 U.S.C. § 1956(h). Section 1956(h) provides as follows:

> Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

18 U.S.C. § 1956(h). This court has not had occasion to determine what elements of proof are necessary to establish a violation of § 1956(h). However, the Third Circuit has held that a conviction for violation of § 1956(h) requires that the government prove the following three elements:

> (1) the conspiracy, agreement, or understanding to commit money laundering was formed, reached, or entered into by two or more persons; (2) at some time during the existence or life of the conspiracy, agreement, or understanding, one of its alleged members knowingly performed one of the overt acts charged in the indictment in order to further or advance the purpose of the agreement; and (3) at some time during the existence or life of the conspiracy, agreement, or understanding, the defendant knew the purpose of the

46

> agreement, and then deliberately joined the
> conspiracy, agreement or understanding.

United States v. Conley, 37 F.3d 970, 976-77 (3d Cir. 1994).

The Supreme Court has held that a conviction of conspiracy to commit a drug crime in violation of 21 U.S.C. § 846 does not require proof of an overt act in furtherance of the conspiracy. See United States v. Shabani, 513 U.S. 10, 15 (1994). Section 846 has language virtually identical to the language of § 1956(h).[9] Neither the Supreme Court nor this court has had occasion to determine whether 18 U.S.C. § 1956(h) also lacks an overt act requirement. We need not address this issue here because the substantive money laundering offenses discussed in Parts III.E.1 and III.E.2, supra, satisfy an overt act requirement, should such a requirement exist.

Because we have concluded that Garcia Abrego's convictions for laundering money in violation of § 1956(a)(1)(A)(i) and (a)(2)(A) are sustainable on a theory of coconspirator vicarious liability, we necessarily conclude that sufficient evidence exists for the jury to have concluded beyond a reasonable doubt that Garcia Abrego knowingly participated in a conspiracy, one of

---

[9]  Section 846 provides as follows:

Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

21 U.S.C. § 846.

47

the objects of which was to commit money laundering offenses involving drug proceeds.

### G.   Sufficiency of the Evidence Supporting the Conviction for Conducting a CCE

Count 20 of Garcia Abrego's indictment charged him with conducting a CCE in violation of 21 U.S.C. § 848. "A conviction for [CCE] requires proof that a defendant organized, supervised or managed five or more persons in a continuing series of drug violations from which the defendant obtained substantial income." United States v. Sotelo, 97 F.3d 782, 789 (5th Cir.), cert. denied sub nom., 117 S. Ct. 620 (1996), and cert. denied, 117 S. Ct. 1002 (1997), and cert. denied sub nom., 117 S. Ct. 1324 (1997); see also Garrett v. United States, 471 U.S. 773, 786 (1985). Garcia Abrego argues that the government failed to prove that he derived substantial income from the sale of narcotics and that he organized, led, managed, or supervised five or more individuals. We reject both of these contentions.

### 1.   Substantial Income

In support of his contention that the government failed to prove that he derived substantial income from the sale of narcotics, Garcia Abrego merely cross-references those portions of his brief arguing that insufficient evidence existed to convict him of laundering money and that the district court improperly allowed the admission of foreign bank records. As indicated in Part III.E, supra, we reject Garcia Abrego's

48

argument that insufficient evidence existed to support his convictions for money laundering.  As indicated in Part III.N, infra, we reject his argument that the district court improperly admitted the foreign financial records.

Moreover, in May 1988, Dr. Victor Leal, a Brownsville-area ophthalmologist whom Garcia Abrego used as a liason for communicating with Agent DelaO, told DelaO in a recorded conversation that, ten years ago Garcia Abrego was a factory worker and that now he was a "big boss."  Francisco Perez testified that Garcia Abrego told him that he had ordered Ricardo Aguirre to launder $25 million of his money.  Carlos Resendez testified that Garcia Abrego told him that he had $30-35 million in Ricardo Aguirre's name.  Tony Ortiz testified that, during his involvement with Garcia Abrego's organization, he shipped between $60 and 70 million in drug proceeds from New York and Houston back to Matamoros.  Horace Vega testified that he moved $7.5 million for the organization.  Clearly, the jury had ample basis from which to conclude that Garcia Abrego derived substantial income from trafficking narcotics.

### 2.  Organization, Management, or Supervision of Five or More Individuals

Garcia Abrego conclusorily argues that insufficient evidence existed for the jury to conclude beyond a reasonable doubt that he acted as an organizer, supervisor, or manager of five or more individuals in his narcotics trafficking activities.  The

49

testimony of Garcia Abrego's coconspirators summarized in Part III.D.1, <u>supra</u>, constitutes sufficient evidence for the jury to conclude that Garcia Abrego acted in such a capacity with far more than five people.  The government adduced a great deal of evidence in the form of testimony from coconspirators indicating that Garcia Abrego was the leader of a very large narcotics trafficking enterprise with a pyramid-like hierarchy.  The testimony of coconspirators provided a basis for the jury to conclude (1) that Luis Medrano and Oscar Malherbe worked directly for Garcia Abrego and that he delegated to them substantial managerial authority; (2) that Medrano and Malherbe in turn delegated responsibility for smuggling drugs and their proceeds to individuals such as Jaime Rivas, Tony Ortiz, and Carlos Rodriguez; and (3) that these individuals in turn recruited numerous other individuals to actually package, load, and ship narcotics and their proceeds.  The fact that Garcia Abrego did not directly control the actions of many of these individuals is irrelevant; that their actions were directly supervised or managed by individuals to whom Garcia Abrego delegated authority indicates that Garcia Abrego organized, supervised, or managed them for purposes of § 848.  <u>See</u> <u>United States v. Tolliver</u>, 61 F.3d 1189, 1216 (5th Cir. 1995) (holding that the defendant possessed managerial authority over individuals for purposes of the CCE statute because they worked for one of the defendant's subordinates), <u>vacated on other grounds</u>, <u>Sterling v. United</u>

States, 516 U.S. 1105 (1996), and vacated on other grounds, Moore v. United States, 117 S. Ct. 40 (1996); United States v. Hinojosa, 958 F.2d 624, 630 (5th Cir. 1992) ("'[A] defendant may not insulate himself from CCE liability by carefully pyramiding authority so as to maintain fewer than five direct subordinates.'" (quoting United States v. Ricks, 882 F.2d 885, 891 (4th Cir. 1989) (brackets in original)).

Apparently recognizing the futility of simply arguing that the jury could not rationally conclude beyond a reasonable doubt that he organized, managed, or supervised five or more individuals in his drug trafficking enterprise, Garcia Abrego principally argues that his conviction for conducting a CCE must be set aside because the jury could have concluded that he supervised individuals who as a matter of law could not constitute his supervisees (e.g., individuals with whom Garcia Abrego merely had a buyer/seller relationship). In essence, Garcia Abrego is challenging the district court's jury instruction on the CCE offense on the ground that it allowed the jury to convict him based upon a theory of liability that was not legally viable. See Griffin v. United States, 502 U.S. 46, 59 (1991) (noting that a conviction is invalid "[w]hen . . . jurors have been left the option of relying upon a legally inadequate theory . . . [because] there is no reason to believe that their own intelligence and expertise will save them from that error"). Because Garcia Abrego did not object to the CCE instruction on

51

these grounds at the district court level,[10] we review his claim for plain error.  See FED. R. CRIM. PROC. 52(b); United States v. Jones, 132 F.3d 232, 243 (5th Cir. 1998).

Under the plain error standard, we may reverse only if "(1) there was error (2) that was clear and obvious and (3) that affected [Garcia Abrego's] substantial rights."  United States v. Dupre, 117 F.3d 810, 817 (5th Cir. 1997), cert. denied, 118 S. Ct. 857 (1998); see also United States v. Olano, 507 U.S. 725, 731-36 (1993).  "Normally, although perhaps not in every case, the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong" of the plain error inquiry.  Olano, 507 U.S. at 735.  Even when these criteria are satisfied, we should exercise our discretion to reverse only if the error "seriously affects the fairness, integrity or public reputation of judicial proceedings."  Id. at 732 (internal quotation marks and brackets omitted); see also Dupre, 117 F.3d at 817.

---

[10]  Garcia Abrego proffered a proposed supplemental instruction on CCE stating the following:

> The act of supplying cocaine, or "fronting" cocaine to a customer does not constitute without more, a basis for determining that the supplier organized, managed or supervised either his buyers or his buyers [sic] customers.

However, during formal objections to the district court's jury charge, Garcia Abrego withdrew this proposed instruction "because the Court [was] giving [it] in other ways, shape or form."

52

The jury instruction regarding the organizer/supervisor/ manager element of the CCE offense tracked the language of the Fifth Circuit Pattern Jury Charge, which provides as follows:

> The term "organizer, supervisor, or manager" means that the defendant was more than a fellow worker and that the defendant either organized or directed the activities of five or more other persons, whether or not the defendant was the only organizer or supervisor.

COMMITTEE ON PATTERN JURY INSTRUCTIONS, DISTRICT JUDGES ASS'N FIFTH CIR., PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) 239 (1997).

Assuming, merely for the sake of argument, that a juror strictly complying with this instruction--as we assume that the jurors in this case did, see United States v. Jimenez, 77 F.3d 95, 99 (5th Cir. 1996)--could have, as a theoretical matter, found Garcia Abrego guilty of conducting a CCE on the basis of his association with persons who could not have constituted his supervisees as a matter of law,[11] we are unconvinced that such

---

[11] We acknowledge that a number of circuits have held that the statutory language, "other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management" indicates that the term "organizer" as used in § 848 implies a position carrying some degree of managerial authority rather than a position characterized by mere coordination of various players. See, e.g., United States v. Lindsey, 123 F.3d 978, 987-88 (7th Cir. 1997); United States v. Williams-Davis, 90 F.3d 490, 508-09 (D.C. Cir. 1996), cert. denied, 117 S. Ct. 986 (1997), and cert. denied sub nom., 117 S. Ct. 988 (1997); United States v. Witek, 61 F.3d 819, 822-24 (11th Cir. 1995); United States v. Delgado, 4 F.3d 780, 785-86 (9th Cir. 1993). One court indicated that a CCE instruction similar to the one at issue here was erroneous because it failed to highlight the requirement of managerial authority. See Lindsey, 123 F.3d at 985-86.

We have no occasion here to determine whether an individual

53

error rises to the level of plain error.  As noted above, the government adduced a great deal of evidence at trial regarding a large number of individuals over whom the jury could reasonably conclude that Garcia Abrego exerted direct or indirect managerial authority.  Furthermore, Garcia Abrego does not contend that, during argument, the government urged the jury to find Garcia Abrego guilty of conducting a CCE on the basis of his association with individuals who, as a matter of law, could not have constituted his supervisees.  Rather, he merely claims that a handful of the government's witnesses could not have constituted his supervisees.[12]  We find it highly improbable that, in finding

_____

must exercise managerial authority over another individual in order to be considered an organizer as to that individual for purposes of § 848 or whether the district court's instruction was erroneous because of its failure to elucidate such a managerial authority requirement, should it exist, because our review in this case is limited to a review for plain error.  As noted infra, (1) the government presented a great deal of evidence indicating that Garcia Abrego exercised managerial authority, both direct and indirect, over a large number of individuals and (2) Garcia Abrego does not contend that, during argument, the government urged the jury to convict Garcia Abrego of conducting a CCE based upon his association with individuals over whom he did not exert direct or indirect managerial authority.  We are satisfied that any error in the district court's instruction was not plain error because Garcia Abrego has demonstrated no prejudicial impact, and thus no detrimental effect on his substantial rights.  See United States v. Rogers, 126 F.3d 655, 659 (5th Cir. 1997).  We therefore express no opinion as to whether the district court's CCE instruction was actually erroneous.

    [12]  We find Garcia Abrego's assertions in this regard somewhat dubious themselves.  For example, Garcia Abrego claims that William Hoffman could not have constituted his supervisee because Hoffman described himself as a freelance courier and stated that he worked for a number of different individuals.

54

Garcia Abrego guilty of conducting a CCE, the jury rested its verdict upon Garcia Abrego's association with such individuals rather than upon his association with the numerous individuals whom the jury could have correctly concluded were his supervisees. Garcia Abrego has thus failed to demonstrate that any error on the part of the district court in connection with its jury instructions on the CCE offense prejudiced him and thereby affected his substantial rights. Therefore, we hold that the district court did not plainly err, if it erred at all, in its instruction to the jury regarding the CCE offense. See United States v. Lindsey, 123 F.3d 978, 986 (7th Cir. 1997) (holding that the district court did not plainly err in giving the jury an instruction regarding CCE that could have allowed the jury to convict the defendant on the basis of his association with individuals who could not have been his supervisees as a matter of law because there was "adequate evidence of [the defendant's] supervision of a sufficient number of persons whom he clearly 'managed'").

---

However, Hoffman testified that he took orders from Oscar Malherbe and Luis Medrano. This testimony indicates that Garcia Abrego exercised indirect managerial authority over him. See Tolliver, 61 F.3d at 1216. Obviously, § 848 does not require that an individual work exclusively for the defendant in order to be considered the defendant's supervisee.

### H. Impact of the Ex Post Facto Clause on the Money Laundering Conspiracy Conviction

Garcia Abrego contends that all of the acts that formed the basis of his conviction for conspiracy to launder money occurred before October 28, 1992, the effective date of 18 U.S.C. § 1956(h), which raised the maximum penalty for such a conspiracy to the same level as the underlying substantive offense. See 18 U.S.C. § 1956(h). He also argues that, even if only one of the acts comprising the offense occurred before § 1956(h)'s effective date, the Ex Post Facto Clause precludes applying the statute's harsher penalty provisions to the offense.

As an initial matter, we reject Garcia Abrego's argument that his conviction under § 1956(h) violated the Ex Post Facto Clause if <u>any</u> of the conduct in furtherance of the conspiracy occurred before the statute's effective date. Conspiracy is a continuing offense. See <u>Bermea</u>, 30 F.3d at 1577. "'[W]here a crime is still being carried on and continued after the date when the act becomes effective,' a statute imposing a greater penalty for conspiracy does not violate the constitutional prohibition of <u>ex post facto</u> laws." <u>United States v. Todd</u>, 735 F.2d 146, 150 (5th Cir. 1984) (quoting <u>Huff v. United States</u>, 192 F.2d 911, 914-15 (5th Cir. 1951)); <u>see also United States v. Harris</u>, 79 F.3d 223, 229 (2d Cir.), <u>cert. denied</u>, 117 S. Ct. 142 (1996); <u>Bermea</u>, 30 F.3d at 1577; <u>United States v. Garfinkel</u>, 29 F.3d

1253, 1259 (8th Cir. 1994); United States v. Jackson, 845 F.2d 1262, 1265 (5th Cir. 1988).

In circumstances in which many acts in a continuing offense occurred before the effective date of the statute criminalizing the continuing offense, the trial court must inform the jury of the effective date of the statute and instruct the jury that, in order to convict the defendant of the offense, it must find that the offense continued after the effective date of the statute. See Todd, 735 F.2d at 150. The district court gave such an instruction in this case, and the government presented ample evidence that the conspiracy to launder money occurred after the effective date of § 1956(h).

Among the post-October 1992 evidence supporting Garcia Abrego's conviction of conspiracy to launder money is the testimony of Carlos Resendez that he participated in a large cocaine transaction in 1993 and turned the proceeds over to Garcia Abrego in Monterey, Mexico. Additionally, Resendez testified that he picked up money in the United States for Garcia Abrego in 1993. Resendez also testified that he engaged in a cocaine transaction in 1994 and that he delivered the money pursuant to Garcia Abrego's instructions. Furthermore, Tony Ortiz testified that, in November 1992, he delivered approximately $40,000 to Medrano for use in bribing a Mexican official. Based upon this evidence, the jury could reasonably conclude that the money laundering conspiracy continued after the

57

effective date of § 1956(h).  Therefore, Garcia Abrego's

conviction for violation of § 1956(h) did not violate the Ex Post

Facto Clause.

## I.  Admissibility of Garcia Abrego's Custodial Statement

Garcia Abrego challenges the admissibility of the statement

that he made to U.S. law enforcement officials after he was

transferred to U.S. custody by Mexican authorities.  Before

addressing Garcia Abrego's claims regarding his custodial

statement, a synopsis of the facts surrounding that statement is

necessary.

### 1.  Factual Background

Mexican law enforcement officials arrested Garcia Abrego in

Monterey, Mexico on the night of January 14, 1996.  Mexican

officials flew Garcia Abrego to Mexico City that night, and DEA

Agent Lawrence Hensley accompanied them on the flight.  During

the flight, Garcia Abrego drank some tequila.  Without giving

Garcia Abrego Miranda[13] warnings, agent Hensley asked Garcia

Abrego questions about his citizenship and the seizure of cocaine

and money.  The government contends that Garcia Abrego made no

specific admissions of wrongdoing, and Garcia Abrego does not

specify the content of his statement.

Garcia Abrego stayed the night in Mexico City in the custody

of Mexican officials.  The next morning, he received injections

---

[13]  Miranda v. Arizona, 384 U.S. 436 (1966).

58

of a number of blood pressure medications.  That afternoon,

Mexican officials took Garcia Abrego to the airport in Mexico

City.  Garcia Abrego requested an attorney or to be taken before

a judge.[14]  Mexican officials complied with neither request.

---

[14]  In a post-oral argument letter brief that, pursuant to
court instructions, was to address only the adequacy of record
support for arguments that had already been made, Garcia Abrego
argues for the first time that his request for a lawyer while in
the custody of Mexican authorities constituted an invocation of
his Fifth Amendment right to counsel.  He therefore contends that
has later custodial statement at the FBI office was presumptively
involuntary because he was not provided access to a lawyer prior
to the statement.  See Edwards v. Arizona, 451 U.S. 477, 484-85
(1981) (holding that, once the accused asserts this Fifth
Amendment right to counsel and thereby "expresse[s] his desire to
deal with the police only through counsel, [he] is not subject to
further interrogation by the authorities until counsel has been
made available to him, unless the accused himself initiates
further communication, exchanges, or conversations with the
police").

"[T]his court has repeatedly held . . . [that] we will not
review arguments raised for the first time in a reply brief."
NLRB v. Cal-Maine Farms, Inc., 998 F.2d 1336, 1342 (5th Cir.
1993).  We will not allow Garcia Abrego to do in a limited post-
oral argument submission that which he could not do in a reply
brief.  We therefore decline to resolve Garcia Abrego's Edwards
claim.  However, we note that Garcia Abrego does not claim that,
at the time that he made his request for counsel, he was being
subjected to custodial interrogation.  It is highly questionable
whether Garcia Abrego could have invoked his Fifth Amendment
right to counsel at a point in time prior to custodial
interrogation, particularly at a point when he was not even in
the custody of U.S. officials.  As the Supreme Court observed in
McNeil v. Wisconsin, 501 U.S. 171 (1991),

> We have in fact never held that a person can invoke his
> Miranda rights anticipatorily, in a context other than
> "custodial interrogation[.]"  . . .  Most rights must
> be asserted when the government seeks to take the
> action they protect against.  The fact that we have
> allowed the Miranda right to counsel, once asserted, to
> be effective with respect to future custodial
> interrogation does not necessarily mean that we will

59

While detained at the airport, Garcia Abrego received two 10-milligram injections of Valium.  He was then placed on a Mexican airplane occupied by only Mexican officials and flown to Houston Intercontinental Airport.

Shortly after arriving in Houston, Garcia Abrego was released into United States custody and was taken to the Houston FBI office.  Upon arrival there, he complained of shoulder and back pains that he alleged resulted from Mexican officials forcibly pushing him to the ground and restraining him.  Dr. Gary M. Coleman examined Garcia Abrego, and concluded that he "appeared to be alert[,] . . . was able to converse and answer his questions appropriately[,] . . . did not appear to be somnolent or sleepy, . . . [and did not appear] . . . to be suffering from an excessive amount of any certain medication at the time."  Additionally, the law enforcement officials who interviewed Garcia Abrego testified that he showed no signs of impairment at the time of the interview.

Thereafter, U.S. law enforcement officials read Garcia Abrego his Miranda rights in Spanish, and he signed a form acknowledging that he understood his rights.  United States law enforcement officials then interviewed him.  Agent Hensley

_____

allow it to be asserted initially outside the context of custodial interrogation, with similar future effect.

Id. at 182 n.3 (citations omitted); see also Goodwin v. Johnson, 132 F.3d 162, 180 n.14 (5th Cir. 1997).

60

testified that Garcia Abrego made a number of denials of particular episodes of criminal activity that were identical to statements that he made to Hensley during the flight from Monterrey to Mexico City.

At the suppression hearing, Dr. Coleman testified that an overdose of Valium would be evidenced by signs of somnolence and sleepiness. He also testified that users of Valium develop a tolerance over time and that a given dose of Valium may have varying effects on a particular individual based on a number of other factors, including the level of anxiety the individual is experiencing at the time of administration, his physical size, and the route of administration. Garcia Abrego introduced expert testimony from Dr. Ernest D. Lykissa that a first-time user who received a 20-milligram dose of Valium would be significantly impaired by the drug and that a person who took all of the medication administered to Garcia Abrego by Mexican doctors would be "literally incapacitated." However, Dr. Lykissa clarified that a habitual user could withstand a much higher dosage of Valium than a first-time user and that his conclusions regarding the combined effects of the drugs administered to Garcia Abrego were based on an assumption that he received all of the drugs at one time. Dr. Lykissa also testified that some of the hypertension medication that Garcia Abrego received would block his kidneys' ability to eliminate Valium for a six-hour period. Another expert, Dr. Gloria Keraga, testified that Valium taken in

conjunction with one of the medications given to Garcia Abrego could increase suggestibility. Dr. Keraga admitted that these effects might be different for a chronic user of Valium. Agent Hensley testified at the suppression hearing without objection that Garcia Abrego had used Valium on a daily basis for a number of years prior to his arrest.[15]

## 2. <u>Admissibility</u>

Garcia Abrego argues that his custodial statement at the FBI office was the fruit of his initial un-<u>Mirandized</u> statements to Agent Hensley shortly after his arrest and was therefore inadmissible at trial. He also argues that his custodial statement at the FBI office was rendered independently involuntary by the fact that he was under the influence of drugs that made him susceptible to law enforcement officials' solicitous interrogation. We reject both of these contentions.

### a. <u>Effect of prior un-</u>Mirandized <u>statements</u>

Garcia Abrego's custodial statement at the FBI office was not rendered involuntary by the fact that he previously made un-<u>Mirandized</u> statements to Agent Hensley. <u>Miranda</u> merely created a prophylactic rule that establishes an irrebuttable presumption of involuntariness with respect to statements made during custodial

---

[15] Additionally, at trial, Francisco Perez testified that he purchased Valium for Garcia Abrego on a number of occasions and that Garcia Abrego used Valium on a daily basis from at least 1980 until 1993. Carlos Resendez testified that he also purchased Valium for Garcia Abrego on occasion and that Garcia Abrego was accustomed to using Valium.

62

interrogation that are not preceded by <u>Miranda</u> warnings.  <u>See</u>

<u>McNeil v. Wisconsin</u>, 501 U.S. 171, 176 (1991).  <u>Mirandized</u>

statements made subsequent to an un-<u>Mirandized</u> statement are not

the illegal fruit of the prior statement unless the prior

statement was <u>actually involuntary</u> as opposed to merely presumed

involuntary on the basis that it was given without the benefit of

<u>Miranda</u> warnings.  <u>See</u> <u>Oregon v. Elstad</u>, 470 U.S. 298, 310-11

(1985) (holding that, absent evidence that an unwarned statement

was actually the product of police coercion, "a careful and

thorough administration of <u>Miranda</u> warnings serves to cure the

condition that rendered the unwarned statement inadmissible.").

The record provides no indication that Garcia Abrego's statements

to Agent Hensley were involuntary.  Therefore, these statements

did not taint Garcia Abrego's later statement at the FBI office.

b.   <u>Actual voluntariness</u>

Garcia Abrego next argues that the drugs that Mexican

officials administered to him, coupled with the solicitousness of

U.S. law enforcement officials, rendered his custodial statement

involuntary.  We disagree.  When a defendant challenges the

voluntariness of a confession, the government must prove its

voluntariness by a preponderance of the evidence in order for the

confession to be admissible as substantive evidence at the

defendant's criminal trial.  <u>See</u> <u>Self v. Collins</u>, 973 F.2d 1198,

1205 (5th Cir. 1992).  While the ultimate determination of

voluntariness is a question of law reviewed de novo, this court

63

must accept the factual conclusions underlying the district court's determination of voluntariness unless they are clearly erroneous. See United States v. Restrepo, 994 F.2d 173, 183 (5th Cir. 1993).

"A confession is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice." United States v. Broussard, 80 F.3d 1025, 1033 (5th Cir.), cert. denied sub nom., 117 S. Ct. 264 (1996). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986). However, "[a] defendant's mental condition still properly figures into the voluntariness calculus. Police exploitation of the mental condition of a suspect, using 'subtle forms of psychological persuasion,' could render a confession involuntary." United States v. Raymer, 876 F.2d 383, 386-87 (5th Cir. 1989) (quoting Connelly, 479 U.S. at 164).

The record contains ample evidence from which the district court could conclude that the drugs that Mexican authorities administered to Garcia Abrego did not impair his mental capacity. Dr. Coleman's testimony that Garcia Abrego did not appear impaired and evinced none of the symptoms of a Valium overdose, together with the testimony of the officers who interviewed Garcia Abrego that he appeared in no way impaired, provided an

64

adequate basis for the district court's conclusion that Garcia Abrego's mental capacity was not impaired as a result of the drugs that he had been administered earlier in the day. Additionally, Agent Hensley's testimony that, during the interview, Garcia Abrego made many of the same denials of particular episodes of criminal conduct that he had previously made to Hensley during the trip from Monterrey to Mexico when no Valium was in his system indicates that the Valium injections had not diminished Garcia Abrego's mental capacity. The district court was presented with conflicting expert testimony regarding the probable effect of Valium and the other drugs administered to Garcia Abrego, and the court was free to make credibility assessments regarding the different expert witnesses. See United States v. Ponce, 8 F.3d 989, 998 (5th Cir. 1993). Moreover, the district court was free to accord great weight to the testimony of those individuals who actually observed Garcia Abrego prior to his interview with law enforcement authorities. Thus, we cannot say that the district court's determination that the medication that Garcia Abrego received did not render him mentally impaired at the time of his interview with law enforcement officials was clearly erroneous.[16]

---

[16] Garcia Abrego also claims that he "was particularly susceptible to entreaties by U.S. authorities" because he alleges that he was mistreated by Mexican authorities and feared their return. The only evidence that the district court heard indicating mistreatment by Mexican authorities consisted of testimony and out-of-court statements from Garcia Abrego himself,

Moreover, Garcia Abrego has demonstrated no overreaching by law enforcement officials, which, as noted earlier, is a prerequisite to a determination that a confession is involuntary for purposes of the Fourteenth Amendment Due Process Clause. The mere fact that law enforcement agents were solicitous and attempted to create a favorable climate for confession did not render Garcia Abrego's statement involuntary. See United States v. Barlow, 41 F.3d 935, 944 n.26 (5th Cir. 1994).[17] Garcia Abrego contends that the solicitousness of law enforcement officials constituted an exploitation of his vulnerable mental state. However, as indicated above, the district court had an ample basis for concluding that Garcia Abrego did not possess a vulnerable mental state capable of exploitation. Therefore, the district court properly concluded that the government established by a preponderance of the evidence the voluntariness of Garcia Abrego's statement at the FBI office. The statement was thus admissible as substantive evidence at Garcia Abrego's trial.

### J. Validity of Garcia Abrego's Waiver of His Miranda Rights

---

and the court was free to make a negative credibility assessment regarding this evidence. See Ponce, 8 F.3d at 998.

[17] Additionally, although we have concluded that the district court's factual determination that the drugs administered to Garcia Abrego had no deleterious effect on his mental condition was not clearly erroneous, it is worth noting that the district court found, on the basis of Agent Hensley's testimony, that United States law enforcement officials had no involvement in the administration of drugs to Garcia Abrego. This factual determination was not clearly erroneous.

In an effort to attack the admissibility of his confession from a slightly different angle, Garcia Abrego contends that he did not validly waive his <u>Miranda</u> rights prior to his statement to law enforcement agents at the FBI office. A defendant's waiver of his <u>Miranda</u> rights is only effective if the waiver is knowingly, intelligently, and voluntarily made. <u>See</u> <u>Moran v. Burdine</u>, 475 U.S. 412, 421 (1986). As with the issue of the voluntariness of a custodial confession, a district court's determination regarding the validity of a defendant's waiver of his <u>Miranda</u> rights is a question of law reviewed de novo, but this court accepts the factual conclusions underlying the district court's legal determination unless they are clearly erroneous. <u>See</u> <u>United States v. Flores</u>, 63 F.3d 1342, 1363 (5th Cir. 1995). Additionally, as with a challenge to the voluntariness of a confession, when the defendant challenges the validity of his waiver of his <u>Miranda</u> rights, the government bears the burden of proving the validity of the waiver by a preponderance of the evidence. <u>See</u> <u>United States v. Hurtado</u>, 905 F.2d 74, 76 (5th Cir. 1990).

Garcia Abrego does not dispute that the law enforcement officers who interviewed him read him his <u>Miranda</u> rights in Spanish and that he stated to them that he understood each of these rights. However, he argues that his impairment from the medication that he had received from Mexican doctors, coupled with his lack of education and experience with the U.S. judicial

67

system, precluded a knowing and voluntary waiver.  In support of his contention that the medication that he received precluded a voluntary waiver, Garcia Abrego points to essentially the same expert testimony to which he points in support of his contention that his custodial statement was involuntary.[18]  For the same reasons outlined in Part III.I, <u>supra</u>, we conclude that the district court had an adequate basis for concluding that the medication that Garcia Abrego received did not render him mentally impaired at the time law enforcement authorities read him his <u>Miranda</u> rights.

In further support of his contention that he could not knowingly, intelligently, and voluntarily waive his <u>Miranda</u> rights, Garcia Abrego points to the fact that he has only the equivalent of an eighth grade education.  He also relies on the district court's statement in connection with a hearing regarding disqualification of counsel on the basis of conflicts of interest that Garcia Abrego did not understand the conflicts issue and "also [did] not have a rudimentary understanding of his constitutional rights and of the judicial process that now affects his future."  At the hearing that formed the basis of the above statement by the district court, Garcia Abrego disavowed any prior experience with the United States judicial system.  At

---

[18]   In addition, he points to Dr. Keraga's testimony that she "[did not] imagine" that he would have been able to understand his <u>Miranda</u> rights.

68

a later hearing, however, Garcia Abrego admitted that he was previously charged with a criminal offense in the Southern District of Texas, was represented by counsel, and pleaded guilty. This experience provided him with some exposure to the U.S. judicial system. Furthermore, Garcia Abrego claimed that his apparent lack of understanding at the previous hearing resulted from the fact that he could not hear properly and felt poorly, and the court concluded that Garcia Abrego had firmly grasped the conflicts issue. The court further concluded, based upon its interactions with Garcia Abrego as well as the testimony of law enforcement officials regarding the answers that Garcia Abrego provided in response to their questioning, that, at the time he waived his <u>Miranda</u> rights, Garcia Abrego "was of keen mind, intelligent, able to understand what was transpiring and was under no type of coercion or government oppression." As demonstrated above, the record contains ample evidence to support these factual conclusions, and the district court could therefore properly conclude that the government bore its burden of proving by a preponderance of the evidence that Garcia Abrego knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights.

### K. Admissibility of Evidence Regarding the Effects of Habitual Valium Use

Garcia Abrego contends that the district court erred in admitting expert testimony at trial from Dr. Coleman[19] that habitual use of Valium would diminish the effect of the drug. Like other evidentiary rulings, we review a district court's decision to admit expert testimony for an abuse of discretion. See <u>United States v. Griffith</u>, 118 F.3d 318, 322-23 (5th Cir. 1997).

Garcia Abrego called Dr. Coleman as a witness. During direct examination, counsel for Garcia Abrego questioned Dr. Coleman regarding his medical examination of Garcia Abrego upon his arrival in the United States and about the effects of a number of the medications that Mexican authorities had administered to him. Counsel for Garcia Abrego and Dr. Coleman engaged in the following exchange regarding Dr. Coleman's knowledge of Valium dependency:

Q:   Now, do you know anything at all, sir, about
     Valium habituation or Valium dependency? Have you
     ever studied the subject in your particular area
     of expertise?

A:   In medical school we did study the effect of
     Valium and other benzodiazepines.

Q:   But you wouldn't hold out to be able to render an
     expert opinion on that, I take it.

A:   No, not -- it really depends. As a physician who
     uses these medications on a daily basis, I have to
     be knowledgeable about those medications.

---

[19]   In his brief, Garcia Abrego incorrectly refers to Dr. Coleman as Dr. Lykissa, one of his own experts.

Q: But so far as knowing anything about habituation or dependency or holding out to be an expert, would you or not hold yourself out to be an expert in that area?
. . .

A: I don't pretend to be an expert, but I do know something about Valium situations, dependencies. Being a physician, I have to.

Q: All right. I understand. I know something about it, being a lawyer. I have to. But neither of us are experts.

A: I am not certain what the -- qualifications are needed to be an expert on this medication.

Q: Would you not represent yourself here in the court as being an expert?

A: On that particular medication, I don't pretend to be an expert. But as a physician who prescribes the medication, I certainly know quite a bit about it.

On cross-examination, the government asked Dr. Coleman a number of questions regarding his medical education, training, and experience. Dr. Coleman testified that he graduated from medical school and subsequently received six years of training in internal medicine. He stated that he had pharmacological training in drugs that cause dependency and that he prescribed drugs such as Valium to patients on a daily basis. The government then asked Dr. Coleman what effect a twenty-milligram dose of Valium would have on a person who had used the drug on a daily basis for eight to ten years. Garcia Abrego objected on the ground that Dr. Coleman "ha[d] testified that he is not qualified as an expert in that area of practice." The district

71

court overruled the objection on the ground that Dr. Coleman "ha[d] practical experience . . . sufficient to give his opinion." Dr. Coleman then testified that "[s]omeone who has taken Valium for a long period of time, depending on the doses which he has been taking, . . . may have some resistance to that medication" and that such a person "oftentimes can take dosages which are quite high and not manifest the typical symptoms of sedation of someone who does not use this medication."

Garcia Abrego contends that the district court erred in allowing Dr. Coleman to testify regarding the effects of habitual Valium use because he admitted during direct examination that he was not an expert in the area of Valium dependency. However, Dr. Coleman's statements to this effect establish nothing more than that Dr. Coleman may have been unfamiliar with the meaning of "expert" as a legal term of art. Given Dr. Coleman's testimony regarding his medical education and substantial experience in prescribing Valium, we cannot say that the district court abused its discretion in concluding that Dr. Coleman possessed the requisite "knowledge, skill, experience, training, or education" to testify competently regarding the effects of habitual Valium use. See FED. R. EVID. 702.

Garcia Abrego also contends that the government's hypothetical question regarding the effects of a 20-milligram dose of Valium on a person who has used the drug for many years "is not the type of hearsay reasonably relied upon by experts in

72

[Dr. Coleman's field]" and that Dr. Coleman's answer to the question was therefore inadmissible. This argument borders on the frivolous. The hypothetical question itself was obviously not the basis of Dr. Coleman's opinion. His experience with Valium prescription and patient observation, along with his medical training, formed the basis of his opinion. An expert may testify in response to a hypothetical question containing facts that have evidentiary support in the trial record. See, e.g., United States v. Levine, 80 F.3d 129, 135 (5th Cir.), cert. denied, 117 S. Ct. 83 (1996); 2 JOHN HENRY WIGMORE, EVIDENCE §§ 674, 679, 680 (Chadbourn rev. 1979). Garcia Abrego does not dispute that the government presented testimony from two of his coconspirators--Francisco Perez and Carlos Resendez--indicating that Garcia Abrego had used Valium habitually for many years. See note 15, supra. Thus, the district court properly allowed Dr. Coleman to answer the hypothetical question posed by the government.

### L. Constitutionality of the Criminal Forfeiture

Garcia Abrego contends that the district court violated the Double Jeopardy Clause because it based its order of criminal forfeiture on all of the counts for which the jury returned a guilty verdict even though the district court dismissed two of those counts--conspiracy to possess marijuana and cocaine with intent to distribute and conspiracy to import cocaine and

73

marijuana--as lesser included offenses of conducting a CCE. Garcia Abrego relies on the Supreme Court's recent holding in Rutledge v. United States, 517 U.S. 292 (1996), that conspiracy to distribute controlled substances is a lesser included offense of the CCE offense. See id. at 307. He argues that, because he was punished for conducting a CCE, he cannot also be punished for engaging in drug conspiracies. Because the amount that the district court ordered him to forfeit was based upon his engagement in a CCE as well as his engagement in a conspiracy to possess narcotics with intent to distribute and a conspiracy to import narcotics, he argues that the forfeiture violates the Double Jeopardy Clause. Garcia Abrego's argument lacks merit.

In addition to protecting against a second prosecution for the same offense after acquittal or conviction, the Double Jeopardy Clause "protects against multiple punishments for the same offense." Brown v. Ohio, 432 U.S. 161, 165 (1977). The prohibition against multiple punishments for the same offense "is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature." Ohio v. Johnson, 467 U.S. 493, 499 (1984); see also United States v. Halper, 490 U.S. 435, 450 (1989). In this case, the district court ordered Garcia Abrego to forfeit an amount within the limits established by Congress.

74

Section 853(a) of Title 21 of the United States Code, which

defines property subject to criminal forfeiture in connection

with drug crimes, provides as follows:

> Any person convicted of a violation of this
> subchapter or subchapter II of this chapter [which
> include the drug conspiracies with which Garcia Abrego
> was charged] punishable by imprisonment for more than
> one year shall forfeit to the United States,
> irrespective of any provision of State law--
> (1) any property constituting, or derived from, any
> proceeds the person obtained, directly or indirectly,
> as the result of such violation;
> (2) any of the person's property used, or intended to
> be used, in any manner or part, to commit, or to
> facilitate the commission of, such violation; and
> (3) in the case of a person convicted of engaging in
> a continuing criminal enterprise in violation of
> section 848 of this title, the person shall forfeit, <u>in
> addition to any property described in paragraph (1) or
> (2)</u>, any of his interest in, claims against, and
> property or contractual rights affording a source of
> control over, the continuing criminal enterprise.

21 U.S.C. § 853(a) (emphasis added).  The above language

indicates that a defendant convicted of conducting a CCE must

forfeit any property or contract rights affording control over

the criminal enterprise <u>in addition to</u> the items described in

paragraphs (1) and (2) of the provision, which a defendant

convicted of conspiracy to possess narcotics with intent to

distribute or conspiracy to import narcotics would be forced to

forfeit.  <u>See</u> <u>id.</u>  To the extent that Garcia Abrego's

participation in drug conspiracies constituted lesser-included

offenses of his participation in a CCE, the proceeds of the

conspiracies were necessarily proceeds of the CCE.  Therefore,

the amount forfeitable as a result of the conspiracies is

necessarily subsumed in the amount forfeitable as a result of the CCE. The statute would have required the district court to order Abrego to forfeit the same amount regardless of whether the court considered the conspiracy counts. Because the amount that the district court ordered Garcia Abrego to forfeit is within the limits set by Congress, the criminal forfeiture comports with the Double Jeopardy Clause.

## M. Admission of Evidence of Murders

Garcia Abrego contends that the district court erred in admitting evidence that he ordered a number of murders. As noted earlier, we review a district court's evidentiary rulings for an abuse of discretion. See United States v. Torres, 114 F.3d 520, 525-26 (5th Cir.), cert. denied sub nom., 118 S. Ct. 316 (1997), and cert. denied, 118 S. Ct. 316 (1997), and cert. denied sub nom., 118 S. Ct. 316 (1997).

Garcia Abrego first contends that evidence that he ordered a number of murders was inadmissible under Rule 404(b) of the Federal Rules of Evidence[20] because it constituted evidence of

---

[20] Rule 404(b) provides as follows:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses

76

other crimes, wrongs, or acts offered to prove his bad character and action in conformity therewith. He further complains that he did not receive the notice required by Rule 404(b) when the prosecution intends to offer evidence of prior crimes, wrongs, or other acts for purposes other than proving action in conformity with bad character.

Admission of the evidence did not violate Rule 404(b). In order "to avoid the strictures of Rule 404(b) [regarding the admission of character evidence], all the government need do is suggest a logical hypothesis of the relevance of the evidence for purposes other than to demonstrate [the defendant's] propensity to act in a particular manner." United States v. Krout, 66 F.3d 1420, 1431 (5th Cir. 1995). Moreover, "evidence of acts committed pursuant to a conspiracy and offered to prove the defendant's membership or participation in the conspiracy are not extrinsic evidence," i.e. evidence of "other" acts, for purposes of Rule 404(b). Id.; see also United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997), petition for cert. filed, 66 U.S.L.W. __ (U.S. Jan. 26, 1998) (No. 97-7630), and petition for cert. filed, 66 U.S.L.W. ___ (U.S. Feb. 26, 1998) (No. 97-8083). Acts committed in furtherance of the charged conspiracy are themselves

---

pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

FED. R. EVID. 404(b).

77

part of the act charged. See Miller, 116 F.3d at 682. Thus, evidence of such acts constitutes intrinsic evidence--that is, direct evidence of the charged conspiracy itself. See Miller, 116 F.3d at 682; Krout, 66 F.3d at 1431.

The government suggested a logical hypothesis that all of the murders about which it elicited testimony were committed in furtherance of Garcia Abrego's narcotics trafficking conspiracy. The testimony regarding the murders supports this hypothesis. Specifically, Ricardo Garza testified that Garcia Abrego had Oscar "El Profe" Lopez Olivares kill Casimiro Espinoza in order to eliminate drug trafficking competition in the Matamoros area. Francisco Perez testified that Garcia Abrego told him that he had two Mexican officials killed because they were moving drugs without Garcia Abrego's knowledge or permission. Perez also testified that Garcia Abrego told him that he intended to have two newspaper reporters killed because they were writing newspaper articles exposing his drug trafficking activities. Horace Vega testified that Medrano told him that the group wished to have Lopez Olivares killed because he threatened to expose high-level members of the group to the U.S. media. All of this testimony indicates that the killings at issue were in furtherance of Garcia Abrego's drug-trafficking enterprise. Therefore, the evidence of Garcia Abrego's involvement in the murders was not inadmissible under Rule 404(b)'s prohibition on "[e]vidence of other crimes, wrongs, or acts . . . [offered] to

78

show action in conformity therewith."  FED. R. EVID. 404(b).

Indeed, it was not evidence of "other crimes, wrongs, or acts" at

all.  Thus, Rule 404(b) did not require that the government

provide Garcia Abrego with advance notice of its intent to offer

the evidence.

Garcia Abrego also contends that allowing witnesses to

testify regarding his involvement in murders violated Rule 403 of

the Federal Rules of Evidence.[21]  He argues that the danger of

unfair prejudice created by such testimony substantially

outweighed any probative value it might have because the evidence

was not pertinent to the charged drug and money laundering

offenses.  Garcia Abrego argues that the danger of unfair

prejudice was exacerbated by the fact that the government offered

no direct evidence that any killings actually occurred, but

rather relied strictly upon hearsay statements.

Admission of the evidence did not violate Rule 403.

"Testimony presented by the government will invariably be

prejudicial to a criminal defendant.  But Rule 403 only excludes

evidence that would be unfairly prejudicial to the defendant."

---

[21]  Rule 403 provides as follows:

> Although relevant, evidence may be excluded if its
> probative value is substantially outweighed by the
> danger of unfair prejudice, confusion of the issues, or
> misleading the jury, or by considerations of undue
> delay, waste of time, or needless presentation of
> cumulative evidence.

FED. R. EVID. 403.

79

United States v. Townsend, 31 F.3d 262, 270 (5th Cir. 1994).

Because Rule 403 operates to exclude relevant evidence,

application of the rule "'must be cautious and sparing.'" United

States v. Pace, 10 F.3d 1106, 1115-16 (5th Cir. 1993) (quoting

United States v. McRae, 593 F.2d 700, 707 (5th Cir. 1979)).  The

acts of violence to which the evidence at issue here related were

integral parts of the conspiracies and the CCE with which Garcia

Abrego was charged.  The fact that the evidence offered by the

government consisted only of out-of-court statements accompanied

by no physical evidence of murder merely goes to the weight of

the evidence rather than its admissibility.[22]  We therefore

conclude that the district court did not abuse its discretion in

admitting testimony regarding Garcia Abrego's involvement in

murders.  See Miller, 116 F.3d at 682 (holding that the district

court did not abuse its discretion in admitting evidence of

uncharged murders committed in furtherance of the charged

narcotics conspiracy).

------------------------------

[22]  Garcia Abrego does not contest on appeal the district court's determination that Rule 802's general prohibition on the admission of hearsay evidence did not bar the admission of the statements on the ground that they all constituted admissions by a party-opponent.  See FED. R. EVID. 801(d)(2) (defining statements of a party and statements of a party's coconspirator made during and in furtherance of the conspiracy as nonhearsay when such statements are offered against the party).

### N. Admissibility of Foreign Financial Records

In support of its contention that Garcia Abrego derived
substantial revenue from his drug trafficking activities, the
government offered foreign bank records pertaining to
approximately $30 million that it contended was transferred from
Mexico to the United States, deposited in bank accounts in
McAllen, Texas, and then funneled through the American Express
Company to accounts in Switzerland and the Cayman Islands.
Garcia Abrego levels a number of attacks at the district court's
admission of these records.  Specifically, he argues that
admission of the records violated 18 U.S.C. § 3505, the
Confrontation Clause, and several of the Federal Rules of
Evidence.  We address each of these arguments in turn.

#### 1.  Section 3505

Garcia Abrego initially challenges the admissibility of the
foreign bank records under 18 U.S.C. § 3505.  Section 3505
provides in relevant part as follows:

> (a)(1) In a criminal proceeding in a court of the
> United States, a foreign record of regularly conducted
> activity, or a copy of such record, shall not be
> excluded as evidence by the hearsay rule if a foreign
> certification[23] attests that--
> > (A) such record was made, at or near the time of
> > the occurrence of the matters set forth, by (or

_____

[23]  Subsection (c) of the statute defines a foreign
certification as "a written declaration made and signed in a
foreign country by the custodian of a foreign record of regularly
conducted activity or another qualified person that, if falsely
made, would subject the maker to criminal penalty under the laws
of that country."  18 U.S.C. § 3505(c)(2).

from information transmitted by) a person with knowledge of those matters;

    (B) such record was kept in the course of a regularly conducted business activity;

    (C) the business activity made such a record as a regular practice; and

    (D) if such record is not the original, such record is a duplicate of the original;

unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

    (2) A foreign certification under this section shall authenticate such record or duplicate.

    (b) At the arraignment or as soon after the arraignment as practicable, a party intending to offer in evidence under this section a foreign record of regularly conducted activity shall provide written notice of that intention to each other party. A motion opposing admission in evidence of such record shall be made by the opposing party and determined by the court before trial. Failure by a party to file such motion before trial shall constitute a waiver of objection to such record or duplicate, but the court for cause shown may grant relief from the waiver.

18 U.S.C. § 3505.

Garcia Abrego contends that the government failed to comply with the notice requirement contained in § 3505(b) because it did not provide notice of its intention to introduce the foreign records until over six months after his indictment[24] even though the government had been in possession of the records in connection with another prosecution for approximately two years.[25] Garcia Abrego thus argues that the government did not

---

[24] Garcia Abrego was arraigned on February 6, 1996. The government gave notice that it intended to introduce the records on August 15, 1996.

[25] Garcia Abrego also complains that the documents were not accompanied by a proper certification as required by § 3505(a)(1). He argues without further explanation that the

82

provide notice "as soon after the arraignment as practicable," as required by the statute and that the records were therefore inadmissible under § 3505.  Id.

As the district court observed, the government "certainly [did] not act[] with diligence in giving [the] notice" required by § 3505(b).  However, we conclude that this lack of diligence did not render the records inadmissible under the statute.  The plain language of § 3505 does not make compliance with the notice requirement a prerequisite to the admissibility of evidence under the statute.  First, subsection (a) of § 3505, which establishes the requirements for admissibility under the section, makes no reference to subsection (b), which establishes the notice requirement.  This would indicate that compliance with the notice requirement is not a precondition of admissibility.  Subsection (b) also contains a requirement that the party opposing admission of a foreign record under § 3505 must object before trial or otherwise waive the objection.  This would indicate that the provisions of subsection (b) are meant to facilitate pretrial determinations of the admissibility of foreign records under

certifications were improper because they were made in connection with another criminal case.  However, the matters that the statute requires that the certification address mirror the four requirements for rendering a normal business record admissible under the business records exception to the hearsay rule, none of which are case-specific.  Compare 13 U.S.C. § 3505(a)(1) with FED. R. EVID. 803(6).  Garcia Abrego advances no argument as to why the required contents of the certification would be any different in this case than in the previous one.  We therefore reject this argument.

83

§ 3505 rather than establish prerequisites to admissibility under the statute.  The legislative history of § 3505 bears out this conclusion.

The House Report on the bill that ultimately became § 3505 states that "[t]he purpose of the legislation is to make foreign-kept business records more readily admissible into evidence in criminal trials in United States courts."  H.R. REP. NO. 98-907, at 2 (1984), reprinted in 1984 U.S.C.C.A.N. 3578, 3578.  This general statement of § 3505's purpose indicates that the procedural requirements of subsection (b) are designed to facilitate the admission of foreign business records rather than serve as an impediment to their admissibility.  Furthermore, the House Report goes on to state the following:

> Subsection (b) of section 3505 is intended to promote the resolution before trial of questions concerning the admissibility of foreign business records.  Subsection (b) requires that the party intending to offer the foreign business record provide written notification of that intention to all other parties to the case.  Any objection to the admissibility of the foreign record must be made in writing and filed with the court before trial, and the court must decide the motion before trial.  Failure of a party to raise an objection before trial constitutes a waiver of the objection.  The court, for good cause shown, however, can grant relief from the waiver.

Id. at 6, reprinted in 1984 U.S.C.C.A.N. 3578, 3582 (emphasis added).  This passage indicates that the primary purpose of subsection (b) is to force parties opposing the admission of foreign business records to lodge their objections before trial so that questions of admissibility may be resolved at an early

84

stage.  A requirement of early notice of a party's intention to offer such records is a necessary concomitant to a pretrial determination of their admissibility.  Without sufficient pretrial notice of a party's intention to offer foreign business records, it would certainly be unfair to conclude that the party opposing the admission of such records has waived his or her objections to the admissibility of the records by failing to assert them pretrial.  However, were we to conclude that a failure to give timely notice of an intent to offer foreign records under § 3505 bars admission of the records pursuant to the statute, we would flout § 3505's purpose by turning a requirement intended to facilitate the admission of foreign business records into a procedural barrier impeding their admission.  The statute's legislative history indicates that Congress wished to "promote" pretrial resolution of evidentiary disputes regarding foreign business records, not to require such resolution.  Id.

Section 3505 "was not intended to add technical roadblocks to the admission of foreign records, but, rather, to streamline the admission of such records."  United States v. Strickland, 935 F.2d 822, 831 (7th Cir. 1991).  The government provided Garcia Abrego with notice of its intention to offer the foreign records twenty-six days before the suppression hearing at which the district court made the initial determination of their admissibility and forty-eight days prior to their admission into

85

evidence at his trial.  Garcia Abrego never requested more time to investigate the reliability or authenticity of the records and does not now complain that he was in any way prejudiced by the timing of the government's notice.[26]  We therefore conclude that the district court did not abuse its discretion in holding that the foreign bank records were admissible under § 3505.[27]

## 2. Confrontation Clause

Garcia Abrego next argues that admission of the foreign records violated his rights under the Confrontation Clause because he was unable to cross examine the custodian of the records.  He argues that, unlike ordinary domestic business records, foreign records do not occupy a well-rooted exception to the hearsay rule and lack adequate indicia of reliability to be

---

[26]  We express no opinion as to whether a showing of prejudice resulting from untimely notice of an intent to offer foreign records could eliminate § 3505 as a potential pathway for admissibility of foreign business records.

[27]  Garcia Abrego also argues that the records were inadmissible because some of them were incomplete.  He argues that this fact calls into question the integrity and validity of the records, particularly in light of the fact that some of the missing records were available in connection with the previous trial but were unavailable in connection with this one.  Garcia Abrego's claim again lacks merit.  He does not argue that the incompleteness of the records was likely to confuse the jury, nor that the incompleteness of the records rendered them irrelevant. The district court could properly conclude that the incompleteness of any of the records went to their evidentiary weight rather than their admissibility.  Therefore, the district court did not abuse its discretion in admitting the records on the ground that they were incomplete.

admissible without violating the Confrontation Clause.  We
disagree.

The admission of the foreign business records does not
violate the Confrontation Clause so long as the records "bear[]
adequate indicia of reliability."  Ohio v. Roberts, 448 U.S. 56,
66 (1980); see also United States v. Ismoila, 100 F.3d 380, 391
(5th Cir. 1996), cert. denied sub nom., 117 S. Ct. 1712 (1997),
and cert. denied sub. nom, 117 S. Ct. 1858 (1997); Sherman v.
Scott, 62 F.3d 136, 140 (5th Cir. 1995).[28]  "Evidence is
considered reliable if it falls within a firmly rooted hearsay
exception or is otherwise supported by a showing of
particularized guarantees of trustworthiness."  Ismoila, 100 F.3d
at 391-92.  "[E]vidence possessing 'particularized guarantees of
trustworthiness' must be at least as reliable as evidence
admitted under a firmly rooted hearsay exception . . .[and] must
similarly be so trustworthy that adversarial testing would add

---

[28]  In Roberts, the Supreme Court stated, "when a hearsay
declarant is not present for cross-examination at trial,  the
Confrontation Clause normally requires a showing that he is
unavailable.  Even then, his statement is admissible only if it
bears adequate 'indicia of reliability.'"  Roberts, 448 U.S. at
66.  In White v. Illinois, 502 U.S. 346 (1992), the Court
clarified that "Roberts stands for the proposition that
unavailability analysis is a necessary part of the Confrontation
Clause inquiry only when the challenged out-of-court statements
were made in the course of a judicial proceeding."  Id. at 354;
see also Ismoila, 100 F.3d at 391; Sherman, 62 F.3d at 140.
Because the foreign bank records at issue here do not constitute
"statements . . . made in the course of a judicial proceeding,"
their admissibility does not hinge upon the presence of the
makers of the records to testify at Garcia Abrego's trial or a
showing of their unavailability.

87

little to its reliability."  Idaho v. Wright, 497 U.S. 805, 821 (1990); see also Sherman, 62 F.3d at 140.  We believe that foreign records admissible under § 3505 satisfy these criteria.

The legislative history of § 3505 indicates that Congress adopted the statute in part based upon its view that foreign business records accompanied by the certification required by the statute possess an "inherent trustworthiness."  H.R. REP. NO. 98-907, at 2 (1984), reprinted in 1984 U.S.C.C.A.N. 3578, 3580. Furthermore, the House Report discussing § 3505 indicates that the language in subsection (a) establishing the required contents of the foreign certification "is derived from Rule 803(6) of the Federal Rules of Evidence," which establishes the business records exception to Rule 802's general exclusion of hearsay, and should therefore "be interpreted in the same manner as the comparable language in Rule 803(6) is interpreted."  Id. at 5, reprinted in 1984 U.S.C.C.A.N. 3578, 3581.  "The business records exception is a firmly rooted hearsay exception."  Ismoila, 100 F.3d at 392.  Thus, to the extent that § 3505 largely mirrors the business records exception, we are confident that records admissible under the statute are "at least as reliable as evidence admitted under a firmly rooted hearsay exception." Wright, 497 U.S. at 821.  Our conclusion is bolstered by the fact that the statute requires district courts to exclude records otherwise satisfying its requirements if "the source of

88

information or the method or circumstances of preparation indicate lack of trustworthiness." 18 U.S.C. § 3505(a)(1).

In concluding that admission of records under § 3505 does not violate a defendant's rights under the Confrontation Clause, we join a number of other circuits that have addressed the issue. In United States v. Miller, 830 F.2d 1073, 1078 (9th Cir. 1987), the Ninth Circuit rejected a Confrontation Clause challenge to the admission of foreign bank records under § 3505. In doing so, the court expressed the following rationale:

> Banks depend on keeping accurate records and although, as we all know, they err occasionally, their records are among the most common type of business record routinely used in our courts. The novelty of the statute is to admit the records without confrontation by the defendant with the recordkeepers. No motive is suggested that would lead bank officials to change, distort, or manipulate the records at issue here. The recordkeepers have, under criminal penalties in their own countries, asserted that the records are records kept in the course of business. Examination of the recordkeepers by counsel for [the defendant] could not reasonably be expected to establish anything more or less than that. If the records were in fact inaccurate, it was within [the defendant's] power to depose the recordkeepers and challenge the records. . . . As applied in [the defendant's] case to admit foreign bank records kept in the course of business, section 3505 is constitutional.

Id. at 1077-78. Other circuits have reached similar conclusions, and we now do the same. See United States v. Ross, 33 F.3d 1507, 1517 (11th Cir. 1994) (holding that admission of foreign records pursuant to § 3505 did not violate the defendant's rights under the Confrontation Clause); United States v. Sturman, 951 F.2d 1466, 1490 (6th Cir. 1991) (same). The district court's

89

admission of foreign bank records pursuant to § 3505 did not violate Garcia Abrego's rights under the Confrontation Clause.

### 3. Federal Rules of Evidence

Garcia Abrego asserts a number of challenges to the admissibility of the foreign bank records under the Federal Rules of Evidence. First, Garcia Abrego challenges the relevance of the evidence on the ground that nothing linked him to the bank accounts to which the documents related. However, one of the accounts described in the record was opened in the name of Maria del Carmen Olivella.[29] Garcia Abrego concedes that this is his wife's name.[30] Furthermore, the other accounts listed Ricardo Aguirre as a beneficiary. Francisco Perez testified that, while Garcia Abrego was in hiding in Chicago, he told Perez that he had instructed Aguirre to move $25 million from Monterrey to the

---

[29] Garcia Abrego points out that Olivella was removed as a beneficial owner from this account a few days after it was opened. At most, this is a fact properly considered by the jury in determining the weight to give the records regarding this account in determining whether the funds in the account were traceable to Garcia Abrego. It does not indicate that the records relating to the account are irrelevant. See FED. R. EVID. 401 ("'Relevant evidence' means evidence having <u>any tendency</u> to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (emphasis added)); <u>cf. Rhodes v. Guiberson Oil Tools</u>, 75 F.3d 989, 998 n.2 (5th Cir. 1996) (en banc) (Emilio M. Garza, J., concurring) ("[T]he standard of relevancy under Rule 401 is intentionally much <u>easier</u> to satisfy . . . than the standard for sufficiency of the evidence . . . .").

[30] Additionally, public records of a land transaction introduced at trial listed Garcia Abrego's wife as Maria del Carmen Olivella de Garcia.

United States.  Perez testified that he met with Aguirre in Brownsville and that Aguirre told him that he was moving Garcia Abrego's money through the United States to the Cayman Islands. The funds in the Swiss and Cayman Islands accounts were traceable to accounts in McAllen, Texas owned by the Casa de Cambio Nuevo Leon and the Casa de Cambio Colon, two exchange houses located in Monterrey.  All of this evidence provided ample basis for the district court to conclude that the foreign bank records had some tendency to make the fact that Garcia Abrego had derived substantial income from the sale of narcotics, an element necessary to support his conviction for conducting a CCE, more probable than it would be in the absence of the records.  This is all that is necessary to render the evidence legally relevant. See FED. R. EVID. 401.  The foreign records were also plainly relevant to the money laundering conspiracy count because they evidenced financial transactions of large sums of money that the jury could reasonably conclude constituted proceeds from the sale of narcotics.

Garcia next contends, without any supporting legal analysis, that admission of the foreign records violated Rule 403 of the Federal Rules of Evidence.  Because Garcia Abrego has not demonstrated that the probative value of the records was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless

presentation of cumulative evidence," this argument lacks merit. FED. R. EVID. 403.

Garcia Abrego next contends, without explanation, that admission of the records violated Rule 404(b) of the Federal Rules of Evidence. This argument also lacks merit. As demonstrated above, the foreign records constituted intrinsic evidence that Garcia Abrego engaged in a CCE and a money laundering conspiracy rather than extrinsic evidence of other crimes, wrongs, or acts offered to prove Garcia Abrego's bad character and his propensity to act in conformity therewith. Accordingly, admission of the financial records did not violate Rule 404(b). See United States v. Davis, 19 F.3d 166, 171 (5th Cir. 1994).

Finally, Garcia Abrego contends that admission of the foreign bank records violated Rule 802, which generally precludes the admission of hearsay. See FED. R. EVID. 802. This argument ignores the fact that § 3505 creates an exception to Rule 802. See 18 U.S.C. § 3505 (providing that foreign records meeting its criteria "shall not be excluded as evidence by the hearsay rule"); Sturman, 951 F.2d at 1490 ("Section 3505 establishes an exception to the hearsay rule for foreign business documents."). Rule 802 thus could not operate to preclude admission of the foreign bank records.

## IV.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment of conviction and sentence.